2014 CO 39

The PEOPLE of the State of Colorado, Plaintiff–Appellant

v.

Jay Carwile MCINTYRE, Defendant–Appellee.

Supreme Court Case No. 13SA235

Supreme Court of Colorado.

May 27, 2014

Attorneys for Plaintiff–Appellant: Daniel Howard May, District Attorney, Fourth Judicial District, Christopher Alexander Sutton, Deputy District Attorney, Doyle Jon Baker, Senior Deputy District Attorney, Colorado Springs, Colorado.

Attorneys for Defendant–Appellee: Kelly M. McCullough, Deputy State Public Defender, Colorado Springs, Colorado.

JUSTICE BOATRIGHT delivered the Opinion of the Court.

¶ 1 In this interlocutory appeal pursuant to C.A.R. 4.1, the People seek review of the trial court's order suppressing inculpatory statements of the Defendant–Appellee, Jay Carwile McIntyre. The trial court found that McIntyre did not make the statements voluntarily. We hold that, when considering the totality of the circumstances, the police did not improperly coerce McIntyre into making the statements but that he instead spoke voluntarily. Accordingly, we reverse the trial court's suppression order and remand the

matter to the trial court for proceedings consistent with this opinion.

## I.  Facts and Procedural History

¶2  In 2012, McIntyre's niece, J.M., accused him of sexually assaulting her on two separate occasions in 2007, when she was 10 years old.  Specifically, J.M. alleged that McIntyre sat behind her while helping her with her homework and placed his hands on her stomach, then moved his hands up to her breasts and massaged her breasts through her clothing.  J.M. further alleged that, some time later, McIntyre touched her posterior, ran his hand down between her legs, and rubbed her vagina over her clothes.

¶3  After the police contacted him, McIntyre appeared for a scheduled interview with Detective Otto at the El Paso County Sheriff's Department.  At the outset of the interview, Detective Otto read McIntyre *Miranda* warnings and informed him that he could stop answering her questions at any time; she then showed him that the door was unlocked.  Detective Otto proceeded to speak with McIntyre for roughly 44 minutes.  Her tone was cordial throughout, and McIntyre appeared lucid and alert.  He repeatedly stated that he was "flabbergasted" by J.M.'s allegations and that he remembered no such incidents.  He specifically indicated that it was unlikely that he would have helped J.M. with her homework because he is dyslexic and reads at a fourth-grade level.  He acknowledged, however, that he was using both marijuana and "speed" (methamphetamine) virtually every day at the time of the alleged misconduct and that the drugs could have damaged his memory.  At the conclusion of the interview, Detective Otto asked if McIntyre would be willing to take a lie detector test,[1] and McIntyre agreed without hesitation.

¶4  One week later, McIntyre returned to the sheriff's department to take the lie detector test, which was to be administered by Deputy Porter.  Prior to administering the test, Deputy Porter spoke with McIntyre for roughly 25 minutes.  As with Detective Otto, Deputy Porter's tone was conversational, and McIntyre exhibited no signs of distress. Deputy Porter showed McIntyre that the door was unlocked, told him that he was free to leave at any time, and read him *Miranda* warnings.  He also stated that "the results of the exam can't be used in court unless you want them to be."  McIntyre then initialed and signed a consent form for the test.

¶5  Deputy Porter next told McIntyre that before beginning the test, he wanted to consult with him in order to properly formulate the questions.  To illustrate this process, he relayed an anecdote regarding a lie detector test that he had conducted with a college student accused of dealing drugs.  When Deputy Porter asked the student, "Have you ever distributed narcotics?" the student said "no" and failed the test.  Deputy Porter then spoke with the student, who admitted that he had bought marijuana and given it to his friends but asserted that he "never made a dime."  Deputy Porter then rephrased the question to, "Have you ever distributed narcotics for a profit?" and the student said "no" and passed.  As a result of the revised question, the police did not prosecute the student because they determined that, although he used marijuana recreationally, he was not a "drug dealer" in the criminal sense.

¶6  Turning to the particulars of McIntyre's case, Deputy Porter emphasized the importance of crafting appropriate questions regarding McIntyre's alleged sexual misconduct.  Deputy Porter first posed a hypothetical in which the police had accused a father of molesting his 18–month–old daughter.  He explained that if he asked the father, "Have you ever touched your daughter's vagina?" he would likely be compelled to answer "yes," meaning a superior question would be, "Have you touched your daughter's vagina for sexual gratification?"  Deputy Porter then asked McIntyre, "Is there any part of this exam that will show that you touched your niece's breasts or vagina for sexual gratification?"  McIntyre responded, "I do not believe so.  I don't recall doing any of this."  McIntyre again confirmed that he was

---

1.  Detective Otto informed McIntyre that the test was a "voice stress analyzer," which differs from a more rigorous polygraph examination.  For simplicity, we refer to the test as a "lie detector test."

using marijuana and methamphetamine at the time.

¶ 7 Deputy Porter then said to McIntyre, "Here's my concern. These exams are extremely expensive.... You're not gonna have to pay for that, unless, eventually if they determine that your niece is telling the truth, they'll come after you for all the legal fees and all that stuff." Shortly thereafter, Deputy Porter reiterated this concern, saying, "I don't want you to go down the rabbit hole of me turning this machine on, incurring the cost of what I charge this department for this exam."

¶ 8 Deputy Porter and McIntyre then discussed the goals of the sheriff's department in sexual assault cases. Deputy Porter stated, "In today's world ... when we have somebody ... especially if they were the victim of an addiction ... our goal is often rehabilitation." After confirming that McIntyre had a spotless criminal background, Deputy Porter repeated, "Our goal isn't to destroy a life. Our goal isn't to ruin a life." Deputy Porter then qualified his legal authority over McIntyre's case, stating, "I can make no legal promises or anything like that, but I know Detective Otto.... She's a good person, and she's all about ... trying to get people the help they need."

¶ 9 Deputy Porter then asked McIntyre if he knew how the subconscious worked. McIntyre answered, "Kind of. That's what I'm thinking. I'm thinking it might be subconscious. I might remember it." Deputy Porter suggested that McIntyre had suppressed his memory of the incidents, stating, "I think that you have a memory of something that you're embarrassed about, but it seems to me like you're the kind of person that would be willing to get some help." McIntyre responded, "That's what I want. If I did do it, I want some help."

¶ 10 Continuing in a cordial tone, Deputy Porter said, "This conversation's between us. I'm not the detective working your case." He then encouraged McIntyre to reveal what he remembered:

> Before this [test] starts, tell me what you think you remember, 'cause I think you do. Don't bullshit me.... I honestly think that, with a guy like you with a clean

record, I can give [Detective Otto] a call.... You'll walk out of here, I'll talk to [Detective Otto], you guys'll probably make another appointment, you can come in and sit down and talk with her.... But tell me what you think you remember, 'cause I can see in your eyes that there's some shit floating around there that you haven't told [Detective Otto], and you're scared.

McIntyre then confessed to the allegations in part, stating, "When I first came in, I didn't remember anything. And now that I've been dwelling on it ... I do remember one time downstairs rubbing on her legs, just fun, and I think I do remember going in between her legs, that was just like once [or] twice." Deputy Porter then asked, "So you think she's telling the truth about you rubbing her vagina?" and McIntyre responded, "I do somewhat remember, yeah, a little bit of just, like, rubbing her legs and doing that."

¶ 11 Deputy Porter then informed McIntyre that the lie detector test was no longer necessary. He asked McIntyre if he wished to write an apology letter to J.M., which McIntyre did after Deputy Porter left the room. When Deputy Porter came back, McIntyre signed the letter, and they arranged for McIntyre to return two days later to speak with Detective Otto. When McIntyre arrived at that time, he indicated that he wanted a lawyer, and Detective Otto never conducted the follow-up interview.

¶ 12 The People charged McIntyre with four counts of sexual assault on a child by one in a position of trust and two counts of incest. McIntyre moved to suppress the statements he made during both interviews, arguing that they were involuntary. The trial court denied the motion as to the first interview but granted it as to the second, finding that "the cumulative effect of Deputy Porter's misstatements, innuendos, threats and implicit promises are more than enough to vitiate the voluntariness" of McIntyre's statements. The People filed this interlocutory appeal.

## II. Standard of Review

¶ 13 A trial court's suppression order presents a mixed question of law and fact.

*See People v. Zadran,* 2013 CO 69, ¶ 13, 314 P.3d 830. Although we defer to the trial court's findings of historical fact that are supported by competent evidence, we review the legal effect of those facts de novo. *Id.*

## III. Analysis

¶ 14 The issue presented here is straightforward: whether or not Deputy Porter improperly coerced McIntyre into making inculpatory statements so as to render those statements involuntary. To resolve this issue, we first examine the law surrounding voluntariness and police coercion. We then hold that, considering the totality of the circumstances, Deputy Porter did not unduly coerce McIntyre into making his statements. Accordingly, because McIntyre spoke voluntarily, we conclude that the trial court should not have suppressed his statements.

### A. The Law of Voluntariness and Coercion

■■■ ¶ 15 In order for a defendant's inculpatory statements to be admissible, the due process clauses of the United States and Colorado Constitutions require that he make the statements voluntarily. U.S. Const. amends. V, XIV; Colo. Const. art. II, § 25; *Zadran,* ¶ 9. The government may not coerce the defendant into confessing evidence of his guilt; rather, such evidence must be "independently and freely secured." *Zadran,* ¶ 9. If the defendant makes a prima facie showing of involuntariness at a suppression hearing, the prosecution then bears the burden of establishing by a preponderance of the evidence that he in fact made the statements voluntarily. *Id.*

■■■ ¶ 16 In determining voluntariness, we consider the totality of the circumstances surrounding the statements, particularly "the significant details surrounding and inhering" in the questioning. *People v. Ramadon,* 2013 CO 68, ¶ 20, 314 P.3d 836. Specifically, a law enforcement officer's conduct renders a defendant's statements involuntary if "the behavior of the official was coercive so as to overbear the defendant's will in making the statements." *Zadran,* ¶ 10. The existence of coercion alone, however, does not automatically nullify the voluntariness of a defen-

dant's statements and make them inadmissible. Instead, in order to justify suppression, "the coercive police conduct must have played a significant role in inducing the statement[s]." *Id.*

■■■ ¶ 17 In evaluating whether the police's conduct was coercive, we examine "both the defendant's ability to resist coercive pressures and the nature of the police conduct." *Ramadon,* ¶ 20. Specifically, we consider the following non-exhaustive set of factors:

1. whether the defendant was in custody;
2. whether the defendant was free to leave;
3. whether the defendant was aware of the situation;
4. whether the police read *Miranda* rights to the defendant;
5. whether the defendant understood and waived *Miranda* rights;
6. whether the defendant had an opportunity to confer with counsel or anyone else prior to or during the interrogation;
7. whether the statement was made during the interrogation or volunteered later;
8. whether the police threatened [the] defendant or promised anything directly or impliedly;
9. the method [or style] of the interrogation;
10. the defendant's mental and physical condition just prior to the interrogation;
11. the length of the interrogation;
12. the location of the interrogation; and
13. the physical conditions of the location where the interrogation occurred.

*Zadran,* ¶ 11 (first alteration in original) (quoting *People v. Medina,* 25 P.3d 1216, 1222–23 (Colo.2001)).

¶ 18 With this framework in mind, we now address whether Deputy Porter's interview of McIntyre was unduly coercive.

### B. Application to This Case

■■■ ¶ 19 After reviewing the record and considering the totality of the circumstances,

we conclude that Deputy Porter did not improperly coerce McIntyre into making his inculpatory statements. Again, the critical issue in determining voluntariness is not whether the interviewing officer behaved perfectly but whether he actually overbore the defendant's will. *Zadran*, ¶ 10. Here, the record does not establish that McIntyre was overwhelmed to the point that he relinquished his will and spoke involuntarily. As such, the trial court should not have suppressed his statements.

¶ 20 In its suppression order, the trial court focused almost exclusively on just 2 of the 13 factors announced in *Medina*: "whether the police threatened [the] defendant or promised anything directly or impliedly," and "the method or style of the interrogation." *See* 25 P.3d at 1222. In so doing, the trial court neglected to apply a totality-of-the-circumstances analysis, which our jurisprudence requires. *See Zadran*, ¶ 10 ("The focus of the voluntariness inquiry is whether, *under the totality of the circumstances*, the behavior of the official was coercive so as to overbear the defendant's will in making the statements." (emphasis added)). Our analysis of the 13 *Medina* factors reveals that Deputy Porter did not overbear McIntyre's will.[2] Admittedly, the interview took place in a law enforcement environment, and McIntyre proffered the challenged statements during the interview. But it is undisputed that McIntyre was not in custody, that he received *Miranda* warnings, and that he waived his *Miranda* rights. Additionally, while the trial court found that McIntyre "appeared disheveled and dirty," the interview was relatively short, and the door to the interview room was unlocked. Moreover, the record demonstrates that McIntyre received the opportunity to confer with counsel both prior to and during the interview; not only did McIntyre's interview with Deputy Porter take place a full week after his meeting with Detective Otto (allowing him ample time to consult a lawyer), but Deputy Porter explicitly told McIntyre, "You actually have a right

to an attorney before you're being questioned, while you're being questioned, after you're being questioned, whenever ... you want."

¶ 21 Furthermore, Deputy Porter clearly and repeatedly advised McIntyre that his participation in the interview was entirely voluntary. At the beginning of the interview, not only did Deputy Porter provide McIntyre with *Miranda* warnings, but he also emphasized that McIntyre was free to leave whenever he liked, even going as far as to open the door to the interrogation room to demonstrate that it was unlocked. He reiterated this point several times with the following language:

- "You never have to participate in a [lie detector test]";
- "You're not under arrest";
- "If you get up in the middle of the exam and walk out, I'm just gonna get out of your way, I'm not even gonna stop you";
- "Just because you start talking with law enforcement doesn't mean you have to keep talking"; and
- "You're not in trouble if you stop talking. I don't jump up and punish you for deciding you don't want to talk to us."

These are plain, unambiguous statements that, when weighing the issue of coercion in light of the totality of the circumstances, militate in favor of a finding of voluntariness.

¶ 22 As to the method and style of the interrogation, we note that Deputy Porter did not exploit any unique vulnerability of McIntyre's. *See Medina*, 25 P.3d at 1222 (recognizing that the "deliberate exploitation of a person's weaknesses by psychological intimidation can, under certain circumstances, constitute coercion rendering a statement involuntary" (quoting *People v. Valdez*, 969 P.2d 208, 211 (Colo.1998))). Deputy Porter spoke calmly and cordially throughout, and McIntyre had no difficulty understanding him. Moreover, none of Deputy Porter's comments preyed on any weaknesses of nor induced any fear in McIntyre.

**2.** In analyzing these distinct factors, we do not imply that trial courts should perform a purely quantitative comparison and mechanically tally those factors suggestive of voluntariness against those indicative of coercion. Voluntariness

should not be ascertained through rote tabulation. Rather, analysis of these factors informs a court's decision as to the larger inquiry: whether, under the totality of the circumstances, the police overbore the defendant's will.

*Compare Ramadon,* ¶ 25 (recognizing that the officer's threat of deportation was coercive because "the possibility of deportation was a uniquely terrifying prospect" for the defendant, who was afraid of being killed in his home country), *with Zadran,* ¶ 16 (noting that the officer's questions "attempted to establish a friendly rapport with [the defendant] and did not involve tactics that exploited his weaknesses or vulnerabilities").

¶ 23 Although the trial court did not address the issue of exploitation explicitly, several of its findings suggest that it believed that Deputy Porter took advantage of McIntyre's relatively low education level[3] and poor reading ability. For example, in assessing McIntyre's educational background, the trial court found that he is "functionally illiterate." It further found that the apology letter McIntyre wrote after Deputy Porter left the room was "unintelligible." These findings, however, are unsupported by competent evidence. McIntyre did indicate that he is dyslexic, but he never suggested that he is illiterate. On the contrary, the record establishes that McIntyre can read, albeit with some difficulty. Before having McIntyre sign the consent form for the lie detector test, Deputy Porter made certain that he could understand it, asking, "Do you feel like you can read the words on here, or do you have to take my word for it?" McIntyre responded unequivocally that he could read the form before he initialed and signed it. As to the apology letter, that letter itself was never introduced into evidence, and although Deputy Porter testified that it was "not … exceedingly well-written," he also testified as to its general contents and never suggested that it was unintelligible.

¶ 24 Finally, in assessing whether the police made any implied promises, the trial court highlighted six separate comments from Deputy Porter that combined to "vitiate the voluntariness" of McIntyre's statements. We examine each of these comments in turn and ultimately conclude that, when viewed in light of the totality of the circumstances, they were not implied promises that cumulatively rose to the level of coercion so as to overbear McIntyre's will.

### 1. The Test Results

¶ 25 The trial court first cited Deputy Porter's assertion that "the results of the exam can't be used in court unless you want them to be." The trial court recognized that this statement was erroneous, as results from a lie detector test are per se inadmissible. But this error merely encouraged McIntyre to go forward with the lie detector test; it had no bearing on McIntyre's voluntary decision to speak with Deputy Porter beyond the confines of the test.

¶ 26 The trial court also found that this assertion "implie[d] a sense of confidentiality" to the interview. This is not so. In discussing the purpose of the test, Deputy Porter explained that "usually detectives use [the test] in a case where it's kind of a 'he said, she said' type thing," to which McIntyre responded, "That's pretty much what's going on." Thus, McIntyre recognized that, although the test results could not damage him in court, other detectives might nevertheless review statements he made during the test. And even assuming, arguendo, that Deputy Porter's assertion conveyed the promise of confidentiality, it applied only to the test results, not to the broader interview. In addition, Deputy Porter had advised McIntyre pursuant to *Miranda* that any statements he made could be used in court.

### 2. The College Student

¶ 27 The trial court next objected to Deputy Porter's anecdote regarding the college student accused of distributing marijuana who first failed the lie detector test but then passed after he revealed information that prompted Deputy Porter to rephrase the question. The trial court suggested that the "unmistakable message" of this anecdote was that McIntyre would not face criminal consequences for revealing any information to Deputy Porter.

¶ 28 This reading is overbroad. Deputy Porter told McIntyre the story of the college

---

3. In his interview with Detective Otto, McIntyre stated that he graduated high school but that he "just barely skated by" while earning D's and that "they let me pass."

student in order to articulate the importance of tailoring appropriate questions for the test. He did not suggest, either explicitly or implicitly, that McIntyre would receive immunity for any statements he made.

### 3. The Distinction Between Lawful and Unlawful Sexual Contact

¶ 29 At one point during the interview, Deputy Porter stated, "I'm a guy, if I touch a vagina on a woman, I might get an erection, but if I don't act on that, and I don't put my hands under her clothes, that's way different than if [I digitally penetrate] her." The trial court took issue with this analogy, determining that it "purposely minimiz[ed] the conduct [McIntyre] is alleged to have committed."

¶ 30 This interpretation isolates the analogy from its broader context. Deputy Porter was not referring to McIntyre's conduct specifically. Rather, his aim at this point in the interview was to demonstrate to McIntyre the need to hone the test questions in order to properly address J.M.'s specific allegations. Thus, the analogy operated in conjunction with Deputy Porter's hypothetical about the father accused of molesting his 18–month–old daughter, as both illustrated the importance of tailoring the test questions to the conduct at issue. As such, the analogy, when viewed in context, did not trivialize the severity of McIntyre's alleged conduct.

### 4. The Cost of the Lie Detector Test

¶ 31 The trial court disapproved of Deputy Porter's statements regarding the potential costs of the lie detector test, specifically that (a) the tests are "extremely expensive," (b) McIntyre would not have to pay for the test "unless, eventually if they determine that your niece is telling the truth, they'll come after you for all the legal fees and all that stuff," and (c) "I don't want you to go down the rabbit hole of me turning this machine on, incurring the cost of what I charge this department for this exam." The trial court found these statements to be "tantamount to an overt threat" that McIntyre would face "severe financial consequences" if he did not confess immediately.

¶ 32 We disapprove of interrogation tactics threatening "severe financial consequences" to extract a confession. But Deputy Porter made no such threats. To begin with, his demeanor was not threatening—he never raised his voice but instead consistently spoke in a conversational tone. *Cf. Ramadon,* ¶ 11 (noting that the officer's tone "shifted and started to become more accusatory"). More importantly, even accepting the trial court's finding that his statements were inaccurate (because McIntyre "would not have to pay for the test under any circumstances"), we do not deem them to be coercive. The statements may have deterred McIntyre from taking the lie detector test, but that is not the focus of our inquiry. Rather, the fulcrum of the voluntariness question is whether the law enforcement officer overbore the defendant's will. Significantly, Deputy Porter communicated to McIntyre multiple times that he could terminate the interview at any time. Thus, the mere fact that Deputy Porter impliedly discouraged McIntyre from answering test questions untruthfully did not compel McIntyre to reveal any information outside of the test.

### 5. The Discussion of Rehabilitation

¶ 33 The trial court also found fault with Deputy Porter's suggestion that the sheriff's department was primarily focused on rehabilitation rather than punishment. Specifically, the trial court cited the comments, "Our goal isn't to destroy a life. Our goal isn't to ruin a life.... I know Detective Otto.... [S]he's all about ... trying to get people the help they need." The trial court found this comment to be "remarkabl[y] similar" to a statement made in *People v. Parada,* 188 Colo. 230, 533 P.2d 1121 (1975).

¶ 34 *Parada,* however, is distinguishable from the present case. In *Parada,* we affirmed a suppression order after the interrogating officer told the defendant, "We are not here necessarily to try and get you in trouble." *Id.* at 232, 533 P.2d at 1122. That statement, by its terms, suggests absolute freedom from punishment. Here, in contrast, Deputy Porter's reference to rehabilitation alludes to the *method* of punishment, not its absence. Furthermore, at the same

time as making these comments, Deputy Porter informed McIntyre that he "can make no legal promises." Thus, his statements did not imply a promise of immunity from prosecution.

### 6. The Suggestion of Immunity

¶ 35 Finally, the trial court found that Deputy Porter promised immunity, specifically citing his comments that "[t]his conversation's between us," that he was "not the detective working your case," and that "I honestly think that, with a guy like you with a clean record, I can give [Detective Otto] a call. . . . You'll walk out of here." The trial court found that these representations constituted an "implicit suggestion" that if McIntyre confessed, he would "go free with no criminal consequences."

¶ 36 In a vacuum, these statements would indeed appear to improperly promise confidentiality and freedom from prosecution, and we disapprove of police inducing confessions through such false promises. But that did not occur here. Deputy Porter did not conclude by saying, "You'll walk out of here"; instead, he told McIntyre, "You'll walk out of here, I'll talk to [Detective Otto], you guys'll probably make another appointment, you can come in and sit down and talk with her. . . ." Therefore, Deputy Porter's statement that "[y]ou'll walk out of here" literally referred to McIntyre exiting the interview room—it did not imply that the entire investigation would cease. Additionally, although Deputy Porter stated that "[t]his conversation's between us," he also indicated multiple times that he would discuss McIntyre's statements with Detective Otto. This, in combination with the *Miranda* warnings provided earlier—specifically, that anything McIntyre said could be used against him in court—undercuts any false suggestion of confidentiality.

¶ 37 In sum, the trial court's analysis of Deputy Porter's tactical choices failed to properly consider whether, under the totality of the circumstances, he overbore McIntyre's will. Specifically, in focusing on select comments from Deputy Porter, the trial court afforded little-to-no weight to a number of factors militating in favor of voluntariness: that McIntyre received *Miranda* warnings

and knew he could leave at any time, that he never felt threatened or uneasy, that Deputy Porter did not exploit any unique vulnerability of McIntyre's, and that Deputy Porter made clear that he could "make no legal promises." Therefore, when considering the totality of the circumstances, we conclude that Deputy Porter did not improperly coerce McIntyre into making the statements and thus did not render those statements involuntary.

### IV. Conclusion

¶ 38 For the foregoing reasons, we hold that Deputy Porter did not improperly coerce McIntyre into making the statements at issue but rather that McIntyre spoke voluntarily. Accordingly, we reverse the trial court's suppression order and remand the case to that court for proceedings consistent with this opinion.