517 P.3d 61
The PEOPLE of the State of Colorado, Plaintiff-Appellant
v.Eduardo Rubio BARRERA, Defendant-Appellee.
Supreme Court Case No. 22SA77 Supreme Court of Colorado.
September 26, 2022
Attorneys for Plaintiff-Appellant: Daniel P. Rubinstein, District Attorney, Twenty-First Judicial District, Tearsa Storms Olson, Senior Deputy District Attorney, Grand Junction, Colorado
Attorneys for Defendant-Appellee: Law Office of Suzan Trinh Almony, Suzan Trinh Almony, Broomfield, Colorado
En Banc
CHIEF JUSTICE BOATRIGHT delivered the Opinion of the Court, in which JUSTICE MÁRQUEZ, JUSTICE HOOD, JUSTICE GABRIEL, JUSTICE HART, JUSTICE SAMOUR, and JUSTICE BERKENKOTTER joined.
CHIEF JUSTICE BOATRIGHT delivered the Opinion of the Court.
¶1 In this interlocutory appeal of a suppression order, we consider whether a police officer had reasonable suspicion to conduct a traffic stop. We hold that, under the totality of the circumstances here, the officer lacked such reasonable suspicion. We therefore affirm the trial court's order suppressing the evidence obtained from the search, and we remand for further proceedings consistent with this opinion.
I. Facts and Procedural History
¶2 Eduardo Barrera was driving a Jeep SUV eastbound on I-70 with Isaiah Deaner in the passenger's seat. Trooper Bollen, an officer patrolling the highway, saw the SUV pass by and noted that it was an apparent rental vehicle with Arizona plates. Trooper Bollen testified that he was suspicious because I-70 is a major drug corridor where traffickers frequently use rental vehicles to smuggle contraband, bulk narcotics, people, weapons, and cash. He further testified that he specifically noticed the Arizona plates because Arizona borders Mexico, a main source of bulk narcotics in this part of the country.1 ¶3 Based on these factors, Trooper Bollen decided to follow the SUV.2 The SUV was traveling in the right lane, and the patrol car followed slightly behind in the left lane. The road ahead was clear and straight. Trooper Bollen kept the front of his patrol car in line with the SUV's back axle, driving about seventy-four miles per hour (mph) in a seventy-five mph zone. Up ahead, an emergency vehicle was stopped on the right shoulder of the interstate with its emergency lights on, assisting a truck and trailer. As the SUV and the patrol car approached the stationary emergency vehicle, Trooper Bollen applied his brakes twice and slowed his patrol car to about sixty-two mph, falling behind the SUV. The SUV then activated its left turn signal to indicate its intent to move into the left lane in front of the patrol car. After signaling, the SUV moved into the left lane and traveled in front of the patrol car. The SUV was less than three seconds3 ahead of the patrol car at that point but quickly expanded to create a four-second gap. Trooper Bollen did not apply his brakes again as the SUV moved into the lane in front of him, and the patrol car continued to travel between sixty and sixty-four mph until both vehicles passed the stationary emergency vehicle. Then, Trooper Bollen accelerated to eighty mph before catching up to the SUV and turning on his emergency lights to initiate a traffic stop.
¶4 Once both vehicles stopped, Trooper Bollen told Barrera that he pulled him over because Barrera needed to leave "more space" and had "cut [him] off" but that it was "not a big deal." Trooper Bollen then asked Barrera various questions about where he was going, why he was traveling, who his passenger (Deaner) was, and the purpose of the trip. At the same time, a second officer spoke with Deaner and asked similar questions. Because the two men were traveling from Phoenix to Denver (a route Trooper Bollen believed to be a known drug corridor) and did not give matching answers, Trooper Bollen determined that he had probable cause to search the SUV. Trooper Bollen found a significant amount of illegal drugs in the SUV and arrested both men.
¶5 The People charged both Barrera and Deaner with possession of a controlled substance with intent to distribute. In the companion case, People v. Deaner , 2022 CO 43, 517 P.3d 66, also decided today, Deaner argued that Trooper Bollen violated his constitutional rights because Trooper Bollen did not have reasonable suspicion to conduct the traffic stop. Therefore, Deaner filed a motion to suppress the evidence from the traffic stop. Barrera then filed a motion to adopt the ruling made in Deaner's case. The trial court granted both motions.
¶6 At the motions hearing, Trooper Bollen testified that he believed that Barrera made an unsafe lane change. Relying on the Colorado Driver's Handbook, Trooper Bollen stated that Barrera failed to leave enough room between the cars when changing lanes. Pursuant to the Handbook's "three-second rule," a driver should follow another vehicle at a distance of at least three seconds. According to Trooper Bollen, Barrera made an unsafe lane change because there was less than a three-second gap between the SUV and the patrol car when the SUV moved into the left lane.
¶7 The trial court granted the motion to suppress, finding that the prosecution had not shown that Barrera performed an unsafe lane change. To the contrary, the court found that Barrera turned on the SUV's blinker, waited until Trooper Bollen's patrol car slowed down enough to safely change lanes, and then made the lane change in front of Trooper Bollen's patrol car. Accordingly, the court suppressed all evidence obtained from the search of the SUV.
¶8 The People then filed this interlocutory appeal. II. Jurisdiction and Standards of Review
¶9 Pursuant to C.A.R. 4.1 and section 16-12-102(2), C.R.S. (2022), the People may bring an interlocutory appeal under these circumstances. The People certified that they are not appealing for purpose of delay and that the suppressed evidence is a substantial part of the proof of the charges pending against Barrera. ¶10 "A trial court's suppression order presents a mixed question of law and fact." People v. McIntyre , 2014 CO 39, ¶ 13, 325 P.3d 583, 586. We defer to the trial court's findings of historical fact if they are supported by competent evidence. Id. , 325 P.3d at 587. However, we review the legal effect of those facts de novo. Id.
III. Analysis
¶11 We first discuss the relevant legal principles governing reasonable suspicion. We then apply those principles to the facts of this case and conclude that, under the totality of the circumstances here, Trooper Bollen did not have a reasonable suspicion to conduct the traffic stop. We therefore affirm the trial court's order suppressing evidence obtained from the search.
A. Reasonable Suspicion Standard ¶12 The United States Constitution and the Colorado Constitution both protect individuals from unreasonable searches and seizures. U.S. Const. amend. IV ; Colo. Const. art. II, § 7. This applies to traffic stops. People v. Chavez-Barragan , 2016 CO 16, ¶ 10, 365 P.3d 981, 983. Still, a police officer may conduct a brief investigatory stop without violating an individual's constitutional rights so long as the officer can articulate a reasonable suspicion that criminal activity has occurred, is occurring, or is about to occur. People v. Brown , 2019 CO 63, ¶ 10, 461 P.3d 1, 3 ; Chavez-Barragan , ¶ 10, 365 P.3d at 983 ; see also Terry v. Ohio , 392 U.S. 1, 27, 30-31, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (concluding that a stop is legal if the officer has a reasonable suspicion of criminal activity, the purpose of the stop is reasonable, and the scope and character of the detention is reasonable considering the purpose). Therefore, an officer may stop a vehicle if the officer has reasonable suspicion that the driver has committed a traffic violation. People v. Burnett , 2019 CO 2, ¶ 14, 432 P.3d 617, 621. ¶13 The reasonable suspicion standard requires that a police officer's notion of criminal activity must be "more than a mere generalized suspicion or hunch." People v. Wheeler , 2020 CO 65, ¶ 13, 465 P.3d 47, 52. Rather, they must have "an articulable and specific basis in fact" for suspecting the criminal activity. People v. Arias , 159 P.3d 134, 138 (Colo. 2007) (quoting People v. Smith , 13 P.3d 300, 306 (Colo. 2000) ). In conducting this objective inquiry, we consider the totality of the circumstances, including all facts known to the officer immediately prior to the stop. Id.
B. The Lane-Change Statute
¶14 The People argue that Trooper Bollen had reasonable suspicion that Barrera committed an unsafe lane change, and therefore, the trial court should deny Barrera's motion to suppress the evidence. In order to understand the precise issue before us, it is important to understand the circumstances of the alleged traffic violation. The trial court found (and the dash camera shows) that ahead of Barrera and Trooper Bollen, a stationary emergency vehicle was assisting a truck and trailer on the right-hand shoulder of the road. As the two vehicles approached the stationary emergency vehicle, Barrera turned on his signal and then moved his SUV from the right lane to the left lane in front of the patrol car. The issue before us is whether this lane change was safe or unsafe. See § 42-4-705(2)(a), C.R.S. (2022); § 42-4-1007(1)(a), C.R.S. (2022).
¶15 In such instances, where a vehicle approaches a stationary emergency vehicle, section 42-4-705 of the motor vehicle code governs. Section 42-4-705(2)(b) provides that "the driver of an approaching or passing vehicle shall proceed with due care and caution and yield the right-of-way by moving into a lane at least one moving lane apart from the stationary authorized emergency vehicle." When the approaching vehicle makes a lane change to yield the right-of-way to the stationary authorized emergency vehicle, section 42-4-1007(1)(a) (the lane-change statute) dictates that the approaching "vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety ." (Emphasis added.) Trooper Bollen stopped Barrera for allegedly making an unsafe lane change. Thus, the issue before us is whether the trooper had reasonable suspicion to make that traffic stop.
¶16 The People argue that "made with safety" is ambiguous, and therefore Trooper Bollen properly relied on the Handbook's "three-second rule" as an objective standard to determine whether Barrera safely changed lanes. But the lane-change statute contains no such rule, and the statute is not ambiguous. Furthermore, the Handbook is a regulatory material that doesn't interpret the statute and therefore has limited (if any) relevance to criminal violations. See Christensen v. Harris Cnty. , 529 U.S. 576, 587, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000) (concluding that interpretations contained in materials such as "policy statements, agency manuals, and enforcement guidelines" all "lack the force of law" but instead are " ‘entitled to respect’ ... only to the extent that those interpretations have the ‘power to persuade’ " (quoting Skidmore v. Swift & Co. , 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944) ).
¶17 Instead, we have previously considered the totality of the circumstances to determine whether someone violated the lane-change statute. In Chavez-Barragan , we interpreted a different phrase in the same traffic law. ¶ 8, 365 P.3d at 983. In that case, a police officer pulled over a truck in a work area for twice crossing the white fog line that separates the right lane from the shoulder in violation of section 42-4-1007(1)(a). Chavez-Barragan , ¶ 5, 365 P.3d at 982. Section 42-4-1007(1)(a) dictates that "[a] vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety ." (Emphases added.) We determined that the traffic statute's requirement that a vehicle must drive in one lane "as nearly as practicable" does not establish a bright-line rule; rather, the statute's very language requires a holistic assessment of whether the statute was violated. Chavez-Barragan , ¶ 8, 365 P.3d at 983. We reasoned that "[s]uch an inquiry is proper because what is ‘practicable’ in any given situation depends on the circumstances." Id. at ¶ 19, 365 P.3d at 985 (citing Practicable , Black's Law Dictionary (10th ed. 2014) (defining "practicable" as "reasonably capable of being accomplished; feasible in a particular situation")). We thus determined that the statute directs the driver to ascertain the specific circumstances of the road and to stay in the lane as much as possible. Id. Therefore, we held that assessing a suspected violation of section 42-4-1007(1)(a) requires consideration of the totality of the circumstances. Chavez-Barragan , ¶ 19, 365 P.3d at 984. In that case, we concluded that, based on the totality of the circumstances, Chavez-Barragan's driving created a reasonable suspicion that he'd violated section 42-4-1007(1)(a) because there was no adverse weather and the lane was "adequate in width" despite nighttime conditions, thus making driving entirely within a single lane practicable. Chavez-Barragan , ¶¶ 19-20, 365 P.3d at 984-85. ¶18 True, this case involves the phrase "made with safety" rather than "as nearly as practicable," but the same logic applies with equal force to both phrases, which appear in the same statutory sentence. See § 42-4-1007(1)(a). "Made with safety" has a plain and ordinary meaning: It requires the driver to ascertain that the specific circumstances on the road ensure the lane change doesn't cause danger. See Safe , Black's Law Dictionary (11th ed. 2019) (defining "safe" as "not causing danger"). Therefore, just like the phrase "as nearly as practicable," the phrase "made with safety" directs the driver to assess the specific situation because a driver will only know what is safe by evaluating their surroundings. The language thus doesn't require a bright-line rule; rather, in assessing a suspected violation of section 42-4-1007(1)(a), we must consider the totality of the circumstances.
¶19 With these standards in mind, we now turn to the facts of this case. C. Application ¶20 We now consider the totality of the circumstances of the traffic stop in this case. As the patrol car and the SUV neared the stationary emergency vehicle, Trooper Bollen in the patrol car tapped his brakes twice and slowed down. Barrera then activated his left blinker and moved the SUV in front of the patrol car. Although Trooper Bollen pressed on his brakes twice before the lane change, once the SUV's blinker was activated and the SUV began to change lanes, Trooper Bollen did not apply the brakes again.
¶21 Based on these facts, the trial court found that Trooper Bollen was not forced to apply his brakes to avoid the SUV, nor did he make any other indication that he was surprised that the SUV had changed into the left lane. In addition, Trooper Bollen's slowed speed indicated to Barrera that the patrol car was yielding his lane to the SUV to make the lane change. At that point and before moving over, Barrera put on his left blinker to signal to the patrol car that he wanted to move into the left lane. As required when approaching the stationary emergency vehicle, Barrera "proceed[ed] with due care and caution" by "moving into a lane at least one moving lane apart from the stationary authorized emergency vehicle." See § 42-4-705(2)(b). He thus moved the SUV from the right lane to the left lane without incident, and because the Trooper slowed down, the SUV quickly increased distance between the two cars. Therefore, under the totality of the circumstances, Barrera did not make the lane change "until [he] first ascertained that such movement [could] be made with safety ." See § 42-4-1007(1)(a) (emphasis added). Importantly, Trooper Bollen did not tap on his brakes after Barrera activated his blinker, and nothing indicates that the SUV "cut [him] off." Instead, after changing lanes, the SUV quickly pulled ahead, creating a safe distance between the vehicles. In fact, Trooper Bollen sped up to eighty mph to catch the SUV before activating his overhead lights to stop the SUV. These findings indicate that Barrera made the lane change with safety. ¶22 We thus conclude that, based on the facts and circumstances known to Trooper Bollen immediately prior to the stop, Trooper Bollen did not have an objectively reasonable belief that Barrera committed a traffic violation. Therefore, Trooper Bollen did not have a reasonable suspicion to conduct the traffic stop. It follows that any search that resulted from the traffic stop was unlawful. We thus affirm the trial court's order suppressing the evidence.4 IV. Conclusion
¶23 For the foregoing reasons, we affirm the trial court's order suppressing the evidence obtained from the search and remand for further proceedings consistent with this opinion.
1 The only issue before us is whether the Trooper had reasonable suspicion to stop the SUV for an unsafe lane change.
2 We derive the following observations from our review of the patrol car's dash camera footage, which shows the view of the road ahead, the patrol car's speed, when the brakes were applied, and when the emergency lights were activated. See People v. Madrid , 179 P.3d 1010, 1014 (Colo. 2008) (noting that where there is an audiovisual record and there are no disputed facts outside the recording controlling the issue of suppression, this court sits in a similar position as the trial court and therefore may independently review the recording).
3 After reviewing the dash camera footage, we determine that the SUV traveled between one and one-half to two seconds in front of the patrol car immediately after the lane change. For the purposes of this opinion, we refer to the gap as less than three seconds.
4 The People alternatively argue that even if Barrera didn't commit a traffic violation, Trooper Bollen made an objectively reasonable mistake of law when he concluded that the lane change was unsafe based on the three-second rule. Reasonable suspicion may exist where an officer makes an objectively reasonable mistake about a critical fact or proper interpretation of a statute. Burnett , ¶ 15, 432 P.3d at 621 (citing Heien v. North Carolina , 574 U.S. 54, 66, 135 S.Ct. 530, 190 L.Ed.2d 475 (2014) ). However, the People did not present this argument to the trial court, meaning the issue is not preserved; therefore, we decline to address it.