22CA1900 Peo v Gonsalez 02-20-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 22CA1900
Jefferson County District Court No. 21CR2914
Honorable Robert Lochary, Judge

---

The People of the State of Colorado,

Plaintiff-Appellee,

v.

John Raymond Gonsalez,

Defendant-Appellant.

---

JUDGMENT AFFIRMED

Division I
Opinion by JUDGE WELLING
J. Jones and Schock, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced February 20, 2025

---

Philip J. Weiser, Attorney General, Austin R. Johnston, Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Kevin M. Whitfield, Deputy State Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1     Defendant, John Raymond Gonsalez, appeals the judgment of conviction on one count of felony driving while ability impaired (DWAI) – fourth or subsequent (FDWAI), a class 4 felony.  We affirm.

I.     Background

¶ 2     At around 10:30 a.m., employees at the Jefferson County Action Center[1] called police to report a possible drunk driver whom employees had seen "driving erratically" and cutting in line. According to Action Center employees, the driver was stumbling, mumbling, and "very animated," and after an employee opened the car door to give him food, an empty alcohol bottle — a shooter of Fireball — fell out.  The driver was later identified as Gonsalez.

¶ 3     Although the first call was made at around 10:30 a.m., due to a clerical error, officers weren't dispatched until about 11 a.m., after receiving a second call from an Action Center employee. Officers began arriving on scene about twenty minutes after being dispatched.  Agent Timothy Hazel was the first officer to arrive, followed shortly by Agent Clay Guidry and then Agent Paul

---

[1] The Action Center acts as a resource center for individuals in need by providing them with access to necessities such as food, clothing, and rental assistance.

Ciarvella.  When Agent Hazel first approached Gonsalez's vehicle, he saw an empty shooter of Fireball on the ground near the driver's side of the vehicle.

¶ 4    At some point while speaking with Agent Hazel, Gonsalez "demanded to speak to a sergeant," so Agent Hazel contacted one. Agent Ciarvella, however, was unaware that Gonsalez had requested to speak with a sergeant.  According to Agent Ciarvella, when he arrived, Gonsalez asked him if he was a sergeant.  Agent Ciarvella responded that he wasn't and Gonsalez approached him with an "aggressive" posture.  Because of his aggressive posturing, Agent Ciarvella handcuffed Gonsalez for "safety purposes."

¶ 5    After placing Gonsalez in handcuffs, Agent Ciarvella began questioning him.  Agent Ciarvella asked Gonsalez "if he took a breath test what he thought it'd show."  Gonsalez replied that he thought it would be a ".34."  When Agent Ciarvella said the estimated number sounded high, Gonsalez said that "he was an alcoholic, and that's . . . where he thought he was at then."  At some point, after that exchange with Gonsalez, Agent Ciarvella noticed the Fireball shooter on the ground and Gonsalez "blurted"

2

out that "the shooter probably came from him." According to Agent Ciarvella, his conversation with Gonsalez lasted only a few minutes.

¶ 6 After speaking with witnesses, Agent Ciarvella placed Gonsalez in his patrol car, told him he was under arrest, and advised him of the law regarding express consent at around 12:15 p.m. After being advised, Gonsalez refused to submit to a chemical test of his breath or blood.

¶ 7 The People charged Gonsalez with one count of driving under the influence (DUI) (fourth or subsequent offense) and one count of violation of a protection order prohibiting Gonsalez from consuming alcohol. A jury found Gonsalez guilty of the lesser included offense of FDWAI, and the People voluntarily dismissed the count for violation of a protection order.

## II. Analysis

¶ 8 Gonsalez raises three arguments on appeal, two of which relate to the trial court's rulings on suppression motions and the third of which relates to the sufficiency of the evidence. First, Gonsalez contends that his seizure by police — specifically, placing him in handcuffs — constituted an arrest unsupported by probable cause and necessitating the suppression of any evidence obtained

thereafter.  Second, he contends that inculpatory statements he made after he was handcuffed were the product of a custodial interrogation in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966), and, therefore, should have been suppressed.  Third, he contends that the People failed to introduce sufficient evidence that he had been convicted of at least three prior qualifying convictions, which was necessary to secure a conviction for FDWAI.  Below, we address Gonsalez's two suppression contentions together, followed by an analysis of his sufficiency contention.

A.    The Trial Court Didn't Err by Denying Gonsalez's Motions to Suppress Evidence

¶ 9    Both of Gonsalez's suppression arguments involve his status when he was placed in handcuffs.  Gonsalez contends that upon being placed in handcuffs, he was (1) formally arrested without probable cause and (2) in custody for purposes of *Miranda* and then interrogated in the absence of proper advisements.  The trial court rejected both of these arguments because it concluded that Gonsalez was handcuffed during, and as part of, a proper investigatory stop and that he was neither arrested nor in custody when he was handcuffed and questioned.

¶ 10    We approach Gonsalez's challenges by considering (1) whether the investigatory stop was reasonable in scope and duration considering Gonsalez was placed in handcuffs during the course of that investigatory stop; and (2) whether handcuffing Gonsalez placed him in custody for *Miranda* purposes. Because we conclude that officers conducted a proper and reasonable investigatory stop and that Gonsalez wasn't in custody for *Miranda* purposes, we reject Gonsalez's constitutional contentions and don't reach the issue of whether the officers had probable cause to arrest Gonsalez.

### 1.    Additional Facts

¶ 11    Before trial, Gonsalez filed a motion to suppress evidence for lack of reasonable suspicion and probable cause to detain and arrest him and a motion to suppress illegally obtained statements. The court held a two-day hearing on Gonsalez's suppression motions, at which the court heard from Agent Ciarvella, Agent Guidry, and Agent Hazel. We recount relevant portions of the officers' testimony below.

¶ 12    Agent Hazel testified that upon arriving at the scene, he got out of his car and Gonsalez approached him, appearing "highly agitated" and "animated." Agent Hazel also testified that Gonsalez's

5

eyes were watery, and that, although he couldn't smell any alcohol on Gonsalez because he had lost his sense of smell due to COVID-19, dispatch aired that someone had smelled alcohol on Gonsalez. According to Agent Hazel, Gonsalez was "wondering what was going on" and Agent Hazel told him that there were concerns about his ability to drive. Gonsalez gave Agent Hazel his identifying information, and using that information, Agent Hazel learned that Gonsalez was subject to a protection order prohibiting him from consuming or possessing alcohol.

¶ 13    Agent Hazel also testified that, when Agent Ciarvella arrived, Gonsalez "was very agitated, and he walked up and asked him if he was a sergeant, [and] got really close to him with his arms up by his side." On cross-examination, Agent Hazel testified that he believed Gonsalez got within approximately two to three feet of Agent Ciarvella and that Gonsalez's body language was "aggressive." Agent Ciarvella similarly testified that, when he arrived, Gonsalez approached him with an "aggressive posture." Specifically, Agent Ciarvella testified that Gonsalez leaned forward until he was about eight inches from Agent Ciarvella's face and put his arms out. According to Agent Ciarvella, this prompted him to place Gonsalez

in handcuffs for safety purposes because of "how quickly [Gonsalez] came up to [him], . . . pushing his face and chest forwards toward [him]" in a manner that he deemed "aggressive." Agent Ciarvella testified that he told Gonsalez that he detained him "because of the way he was acting."

¶ 14　　Agent Ciarvella also testified that before he detained Gonsalez, he noticed indicia of alcohol intoxication, including a "moderate-to-strong odor of a[n] unknown alcoholic beverage on [Gonsalez's] breath" and watery eyes. Once Gonsalez was handcuffed, Agent Ciarvella began questioning him about whether he had been drinking. According to Agent Ciarvella, Agent Hazel was near him while he was questioning Gonsalez, but he "didn't remember Agent Guidry being within [the] immediate area." Agent Ciarvella and Agent Hazel both testified that they knew that Action Center staff had taken Gonsalez's keys.

¶ 15　　Because the Action Center didn't want Gonsalez's car left on their property, Agent Guidry began the impoundment process. As part of the impoundment process, Agent Guidry conducted an inventory search of Gonsalez's car and empty Fireball shooters were

found in the car.[2]  Although Agent Guidry began impounding Gonsalez's car, the officers were able to find a family member of Gonsalez's who came and picked up the car, which obviated the need for the officers to have the car towed.

¶ 16    After the hearing, the court denied both of Gonsalez's suppression motions.  Regarding Gonsalez's motion to suppress evidence for lack of reasonable suspicion and probable cause, the court found that the officers had reasonable suspicion to conduct an investigatory stop.  With regard to Gonsalez's motion to suppress illegally obtained statements, the court found that the statements didn't need to be suppressed because Gonsalez wasn't in custody for Fifth Amendment purposes when they were obtained.

2.    Legal Principles and Standard of Review

¶ 17    Individuals are protected from unreasonable searches and seizures by the Fourth Amendment of the United States Constitution and Article II, section 7 of the Colorado Constitution. U.S. Const. amend. IV; Colo. Const. art. II, § 7.  Under the umbrella

---

[2] Agent Ciarvella also testified that Gonsalez asked him to get a cigarette lighter from his car and that, when he entered the car, he saw empty Fireball shooters in the car.

of the Fourth Amendment, there are "three types of police-citizen contacts: consensual encounters, investigatory stops, and arrests." *People v Martinez*, 200 P.3d 1053, 1056 (Colo. 2009). Arrests and investigatory stops are "seizures implicating the protections of the Fourth Amendment and Article II, section 7." *Outlaw v. People*, 17 P.3d 150, 154 (Colo. 2001).

¶ 18 An investigatory stop is less intrusive than an arrest and is "justified upon reasonable articulable suspicion to believe that the detainee is committing, has committed, or is about to commit a crime, and is limited in scope to a brief detention to confirm or dispel that suspicion." *People v. Fields*, 2018 CO 2, ¶ 12. When assessing the reasonableness of an investigatory stop, courts consider "(1) the length of the detention; (2) whether the officer diligently pursued the basis for the initial stop; (3) whether the suspect was required to move from one location to another; and (4) whether there were alternative, less intrusive means available." *People v. Chavez-Barragan*, 2016 CO 66, ¶ 22. This list of factors isn't exhaustive; indeed, in other cases, courts have considered the degree of force used by officers during an encounter. *Id.* at ¶ 23.

¶ 19    An investigatory stop can become an arrest when it "involves more than a brief detention and questioning." *Martinez*, 200 P.3d at 1057.  An arrest is more intrusive than an investigatory stop and "is justified only upon the acquisition of probable cause to believe a crime has been committed by the detainee." *Fields*, ¶ 12.  "Whether a formal arrest has been announced or not, an infringement on the liberty of a detainee exceeding that permitted as an investigatory stop, in the absence of probable cause to arrest, amounts to an unlawful seizure." *Id.*

¶ 20    A suspect must be advised of his rights under the Fifth Amendment before being subjected to a custodial interrogation. *People v. Sampson*, 2017 CO 100, ¶ 17.  The prosecution can't introduce in its case-in-chief any statement "procured by custodial interrogation" that wasn't preceded by "certain warnings." *Effland v. People*, 240 P.3d 868, 873 (Colo. 2010) (citing *Miranda*, 384 U.S. at 444).  A person is in custody for purposes of *Miranda* protections if "a reasonable person in the suspect's position would have believed that his freedom of action had been curtailed to a degree associated with a formal arrest." *Sampson*, ¶ 18.  In assessing whether a suspect is in custody, courts evaluate the totality of the

circumstances surrounding questioning and should consider the following non-exhaustive list of factors:

> (1) the time, place, and purpose of the encounter; (2) the persons present during the interrogation; (3) the words spoken by the officer to the defendant; (4) the officer's tone of voice and general demeanor; (5) the length and mood of the interrogation; (6) whether any limitation of movement or other form of restraint was placed on the defendant during the interrogation; (7) the officer's response to any questions asked by the defendant; (8) whether directions were given to the defendant during the interrogation; and (9) the defendant's verbal or nonverbal response to such directions.

*Id.* (quoting *People v. Matheny*, 46 P.3d 453, 465-66 (Colo. 2002)).

¶ 21    Review of a "trial court's suppression order presents a mixed question of law and fact." *People v. Moreno*, 2022 CO 19, ¶ 12 (quoting *People v. McIntyre*, 2014 CO 39, ¶ 13).  We defer to the trial court's findings of fact if they are supported by the record, but "we review the legal effects of those facts de novo." *Id.*  Determining whether a suspect was in custody for the purposes of *Miranda* "is a mixed question of law and fact." *Sampson*, ¶ 16.  We defer to the trial court's findings of fact and credibility if they are supported by the record, but "we review de novo the legal determination of

11

whether an individual is in custody for" the purposes of *Miranda*.

*Id.*

### 3. Analysis of the Suppression Issues

#### a. The Investigatory Stop Was Reasonable in Scope and Duration and Handcuffing Gonsalez Didn't Convert the Investigatory Stop Into an Arrest

¶ 22 We first address Gonsalez's assertion that the trial court erroneously found that he was subjected to a reasonable investigatory stop when Agent Ciarvella handcuffed him. Gonsalez contends that rather than subject him to a proper investigatory stop, the officers arrested him without probable cause. This, Gonsalez argues, warrants suppression of the fruits of his illegal arrest, including any incriminating statements, the empty shooters found in his car, and his express consent refusal. We discern no error.

¶ 23 When considering the reasonableness of the officers' investigatory stop, the court found that (1) "the length of the intrusion was very brief"; (2) the agents did "diligently pursue the investigation during the detention"; (3) while Gonsalez "was required to move from one location to another," it was reasonable because the intrusion was relatively brief and for the safety of the

officers and others; and (4) "there weren't any less intrusive means that were appropriate given the totality of the circumstances here."

¶ 24     We agree with the trial court's conclusion as to the reasonableness of the investigatory stop.  Gonsalez was handcuffed almost immediately upon Agent Ciarvella's arrival approximately twenty minutes after the first officers responded.  While the entire encounter took over an hour, that doesn't affect our analysis of the status of the stop from the time Gonsalez was handcuffed to the time that he was formally arrested.  Further, during the stop, the officers limited their focus to an investigation of whether Gonsalez had been drinking and driving.  We acknowledge that Gonsalez was moved and handcuffed during the stop.  But Agent Ciarvella testified that these actions were taken due to actions that he perceived as aggressive, and the trial court credited that testimony.  Indeed, the record supports the conclusion that Gonsalez approached Agent Ciarvella, got within approximately eight inches of his face, and took on a potentially threatening posture.  These circumstances support the court's finding that Agent Ciarvella took the least intrusive means available to ensure his safety and the safety of others by handcuffing Gonsalez and directing his

movements. This interaction, therefore, remained a reasonable investigatory stop in both scope and duration.

¶ 25    Agent Ciarvella's handcuffing Gonsalez, by itself, doesn't necessitate a finding that Gonsalez had been placed under arrest. *See People v. Smith*, 13 P.3d 300, 305 (Colo. 2000) (Officers may take actions to ensure their safety during an investigatory stop, "[e]ven the use of handcuffs does not automatically transform a detention into an arrest."). The trial court noted as much when it said that Agent Ciarvella's use of handcuffs during the stop was reasonable because Agent Ciarvella testified that Gonsalez acted aggressively. Accordingly, the court didn't err by rejecting Gonsalez's contention that he was arrested when he was placed in handcuffs and properly concluded that the officers conducted a constitutional investigatory stop.

### b.    Gonsalez Wasn't in Custody for *Miranda* Purposes

¶ 26    Gonsalez separately contends that the trial court erred by finding that he wasn't subjected to a custodial interrogation after Agent Ciarvella handcuffed him. According to Gonsalez, his incriminating statements, namely that his BAC would be a ".34" and that he is an "alcoholic," were the product of a custodial

interrogation in which he wasn't given warnings required by *Miranda.*

¶ 27    In its ruling on Gonsalez's motion to suppress his statements due to *Miranda* violations, the trial court found that the officers subjected Gonsalez to an interrogation. The People don't challenge this finding, and we agree that it was correct. Thus, we need only address the court's conclusion that Gonsalez wasn't in custody for *Miranda* purposes.

¶ 28    In its ruling, the trial court considered the factors set forth in *Sampson.* In particular, the court found that (1) when Gonsalez was handcuffed and questioned, it was daylight, in a public parking lot, with numerous members of the public around; (2) the officers who communicated with Gonsalez did so in a conversational tone and were not overbearing; (3) the duration of the interrogation was very brief; (4) while Gonsalez was restrained, this was done for officer safety and the safety of others; and (5) minimal directions were given to Gonsalez.

¶ 29    The record supports the trial court's factual findings and, applying these factual findings to the law, we conclude that, based

15

on the totality of the circumstances, Gonsalez wasn't in custody for *Miranda* purposes.

¶ 30    After considering the factors set forth in *Sampson,* we conclude that a couple of factors weigh in favor of a custody finding, namely the following:

- At least two officers, Agent Ciarvella and Agent Hazel, were present during the interrogation.

- Officers physically restrained Gonsalez by placing him in handcuffs.[3]

¶ 31    But the balance of the *Sampson* factors weigh against a custody finding, including the following:

- The interrogation occurred during the day, and in a public place.

- The officers' tone was conversational, and they didn't use threatening language when addressing Gonsalez.

- None of the officers ever drew or otherwise brandished a weapon.

---

[3] Although Gonsalez argues that he was further restrained because his keys were taken, his keys weren't taken by the officers and, therefore, that fact doesn't weigh in favor of a custody determination.

- Although the total encounter took over an hour, Agent Ciarvella indicated that he began interrogating Gonsalez almost immediately after he was handcuffed and that his questioning only lasted a few minutes.[4]

- Gonsalez asked the officers questions, primarily about when a sergeant would be present, and they responded to his questions in a conversational tone.

- Although the officers told Gonsalez to stay in one place, that was primarily because he was fidgety, and they had concerns for their safety and the safety of those around them. While it appears that Gonsalez remained fidgety throughout the encounter, the officers' tone remained conversational, weighing against a custody determination.

¶ 32    Based on the totality of circumstances, and applying the *Sampson* factors, we conclude that Gonsalez wasn't in custody for *Miranda* purposes when he was interrogated. Therefore, the trial court properly declined to suppress Gonsalez's statements.

---

[4] Even if, at some point, the detention of Gonsalez became custodial because of the duration that he remained in handcuffs, he wasn't in custody at the time he made the incriminating statements, which was almost immediately after he was handcuffed.

17

### B. Whether the People Presented Sufficient Evidence that Gonsalez had Prior Qualifying Convictions

¶ 33 We next address Gonsalez's assertion that the People introduced insufficient evidence to prove that he had three prior qualifying convictions. According to Gonsalez, the People only provided sufficient evidence to prove that he had two prior qualifying convictions and, therefore, his FDWAI conviction must be vacated. We disagree.

#### 1. Legal Framework and Evidence Admitted at Trial

¶ 34 To convict Gonsalez of FDWAI, the People had to prove that Gonsalez "dr[ove] a motor vehicle or vehicle while impaired by alcohol or by one or more drugs, or by a combination of alcohol and one or more drugs" and that "the violation occurred after three or more prior convictions, arising out of separate and distinct criminal episodes, for DUI, DUI per se, or DWAI; vehicular homicide . . . vehicular assault . . . or any combination thereof." § 42-4-1301(1)(b), C.R.S. 2024. These prior convictions must be proven to a jury beyond a reasonable doubt. *See Linnebur v. People*, 2020 CO 79M, ¶ 8, *abrogated on other grounds by People v. Crabtree*, 2024 CO 40M, ¶¶ 2-3.

18

¶ 35    The jury found that Gonsalez had four prior qualifying convictions: a DWAI in Adams County in 2003; a DWAI in Adams County in 2005; a DUI in Jefferson County in 2008; and a DWAI in Clear Creek County in 2015. On appeal, Gonsalez challenges the sufficiency of the evidence supporting the 2003 and 2015 convictions but concedes the sufficiency of the evidence supporting the 2005 and 2008 convictions.

¶ 36    To prove the 2003 and 2015 convictions, the People admitted Gonsalez's certified Division of Motor Vehicles (DMV) record, including his Colorado driving history. Gonsalez's certified DMV record included the following: his driver's license photo, his driver's license number, his fingerprint, his full name, his date of birth, his height, his sex, his weight, his hair color, his eye color, and the last four digits of his social security number. His official driving history also included the last four digits of his social security number, his driver's license number, his full name, his date of birth, his height, his weight, his eye color, and his hair color. It also stated in his official driving history that he had two prior convictions for DWAI. The first was a 2015 conviction for a violation that occurred in 2014

19

in Clear Creek County. The second was a 2003 conviction for a violation that occurred in 2003 in Adams County.

¶ 37    As corroborating evidence of these convictions, the People introduced a sentencing order[5] for each conviction. Both sentencing orders included the county where Gonsalez was convicted, his name, his date of birth, the case number, that a plea of guilty was entered for DWAI, and a conviction date. In the sentencing order for the 2003 conviction, Gonsalez's date of birth, the date of conviction, the charge he pleaded to, and the county of conviction matched Gonsalez's certified DMV record and his official driving history. Despite these consistencies in the record, the sentencing order didn't include his middle name, and it spelled his last name incorrectly (Gonzalez instead of Gonsalez).

¶ 38    In the sentencing order for the 2015 conviction, Gonsalez's date of birth, his first and last name, the charge he pleaded to, and the county of conviction matched Gonsalez's certified DMV record

---

[5] The People refer to this document interchangeably as "certified record of conviction," "certified conviction," or "certified copy of conviction," whereas Gonsalez refers to it as a "sentence order." These are all the same thing. For clarity, we opted to consistently use the term "sentencing order."

and his official driving history. Like the 2003 conviction, the sentencing order didn't include his middle name. Even more concerning, however, is that the conviction date didn't match, and in fact the sentencing order stated that Gonsalez was convicted in 2018, three years after the date of conviction on the certified DMV record.

¶ 39    For the 2005 and 2008 convictions, the People introduced evidence that Gonsalez committed these underlying offenses with documents that included Gonsalez's full name, his date of birth, his height, his weight, his eye color, his hair color, his sex, the conviction he pleaded to, the date of the plea, and the county where the plea was entered. The biographical information in these documents matches the certified DMV record. But the conviction and the conviction date aren't included in Gonsalez's official driving history. Both documents showing the 2005 and 2008 convictions show that Gonsalez's alias is "Gonzalez, John Raymond."

2.    Standard of Review and Legal Principles

¶ 40    When proof of a prior conviction is a necessary element for an offense, the evidence of identity must be legally sufficient. *See Gorostieta v. People*, 2022 CO 41, ¶ 35. Regardless of preservation,

we review sufficiency of the evidence claims de novo. *McCoy v. People*, 2019 CO 44, ¶ 19.

¶ 41 We apply the substantial evidence test to determine whether the evidence presented at trial is sufficient to support the conviction. *Gorostieta*, ¶ 16. "Under this test, we ask whether the evidence, 'viewed as a whole and in the light most favorable to the prosecution, is substantial and sufficient to support a conclusion by a reasonable mind that the defendant is guilty of the charge beyond a reasonable doubt.'" *Id.* (quoting *People v. Harrison*, 2020 CO 57, ¶ 32). When applying the substantial evidence test, we must "give the prosecution the benefit of every reasonable inference which might be fairly drawn from the evidence." *Harrison*, ¶ 32 (quoting *People v. Perez*, 2016 CO 12, ¶ 25). But we can't serve as a thirteenth juror, even if we would have reached a different conclusion faced with the same evidence. *Id.* at ¶ 33.

¶ 42 If the only evidence of identity offered to match the defendant to the prior conviction are matching names and dates of birth, the evidence is generally legally insufficient. *See People v. Cooper*, 104 P.3d 307, 312 (Colo. App. 2004). Rather, legally sufficient evidence requires that the prosecution "establish an essential link between

22

the prior conviction and the defendant" through "documentary evidence combined with specific corroborating evidence of identification." *Gorostieta*, ¶¶ 25-26.

¶ 43 Documentary evidence is tangible evidence contained in a document or other writing that must be authenticated before it can be admitted into evidence. *See Evidence*, Black's Law Dictionary 697 (12th ed. 2024). Corroborating evidence can include

> (1) evidence specifically identifying the defendant; (2) unique identifiers such as a driver license, prison identification number, or social security number; (3) photographs or fingerprints from the prior case that link that case to the current defendant; (4) a physical description from the prior case that can be compared to the defendant in the present case; (5) distinguishable features of the defendant such as tattoos; or (6) testimony of probation officers or others with personal knowledge positively identifying the defendant as being the same person who had previously been convicted.

*Gorostieta*, ¶ 27. This list of sufficient corroborating evidence isn't exhaustive, and additional evidence, such as matching counties of conviction, can be used to tie the defendant to the prior convictions. *Id.* at ¶¶ 27, 33.

### 3. The People Proved with Sufficient Evidence that Gonsalez had been Previously Convicted of at least Three Qualifying Offenses

¶ 44 Because the People only needed to sufficiently prove that Gonsalez had previously been convicted of three qualifying convictions, only one of the challenged convictions must be proved by sufficient evidence for us to affirm his FDWAI conviction. We conclude that the People sufficiently proved that Gonsalez committed the offense underlying the 2003 conviction. (Thus, we don't analyze whether the People sufficiently proved the 2015 conviction.)

¶ 45 The certified DMV record and official driving history (which includes a photograph that was identified as Gonsalez by the arresting officer at trial) contains abundant specific biographical information about Gonsalez to sufficiently establish that it is his DMV record and official driving history. Thus, the evidence will be sufficient to sustain a felony conviction if these documents can be linked with the sentencing order from the 2003 conviction. Under *Gorostieta,* we therefore must determine whether the People sufficiently proved an essential link between Gonsalez and his 2003 conviction. *Gorostieta,* ¶ 35.

¶ 46    The following information in the 2003 sentencing order exactly matches the information in Gonsalez's certified DMV record and official driving history: Gonsalez's birthdate, the date of conviction, the charge pleaded to, and the county of conviction. But, critically, Gonsalez's name in the 2003 sentencing order is "John R Gonzalez" (with a "z" in place of the "s"), and the 2003 sentencing order doesn't contain any aliases for Gonsalez. This is certainly not a trivial discrepancy. But in determining the sufficiency of the evidence, we look to all of the evidence that was before the jury. In doing so, we observe that both the 2005 and 2008 sentencing orders show "John R Gonzalez" as a known alias. All of this taken together establishes the requisite "essential link between the prior conviction and the defendant" through "some documentary evidence combined with specific corroborating evidence of identification." *Id.* at ¶¶ 25-26, 30-32 (concluding that, although "thin," the evidence presented by the prosecution that the defendant "had the same name and date of birth as the prior defendant, as well as self-authenticating court records of the prior conviction" and that "the prior felony occurred in the same county as the instant case" was sufficient).

¶ 47 Accordingly, we conclude that the People presented sufficient evidence that Gonsalez had previously been convicted of three qualifying offenses and that his FDWAI conviction must stand.

### III. Disposition

¶ 48 The judgment is affirmed.

JUDGE J. JONES and JUDGE SCHOCK concur.