Opinions of the Colorado Supreme Court are available to the public and can be accessed through the Judicial Branch's homepage at http://www.courts.state.co.us. Opinions are also posted on the Colorado Bar Association's homepage at http://www.cobar.org.

ADVANCE SHEET HEADNOTE
May 22, 2017

**2017 CO 48**

**No. 17SA23, <u>People in the Interest of Z.T.T.</u>—Criminal Law—Evidence Suppression.**

This interlocutory appeal requires the supreme court to answer whether a defendant's confession to an Army investigator during basic training was the product of coercion. The supreme court holds that, when a defendant knowingly and intelligently waived his <u>Miranda</u> rights, knew he was free to leave an interview, and confessed to committing a crime during the course of a conversational, friendly interview devoid of coercive promises or threats, he gave his statements voluntarily. The supreme court therefore reverses the trial court's suppression order and remands for proceedings consistent with this opinion.

## The Supreme Court of the State of Colorado

2 East 14th Avenue • Denver, Colorado 80203

### 2017 CO 48

**Supreme Court Case No. 17SA23**

*Interlocutory Appeal from the District Court*

La Plata County District Court Case No. 15JD43

Honorable William L. Herringer, Judge

**Plaintiff–Appellant:**

The People of the State of Colorado,

In the Interest of

**Juvenile–Appellee:**

Z.T.T.

**Order Reversed**

*en banc*

May 22, 2017

**Attorneys for Plaintiff–Appellant:**
Christian Champagne, District Attorney, Sixth Judicial District
Sean Murray, Deputy District Attorney
John-Patrick Sansom, Deputy District Attorney
  *Durango, Colorado*

**Attorneys for Juvenile–Appellee:**
The Walsh Law Firm, LLC
Jeffrey M. Walsh
  *Steamboat Springs, Colorado*

Greenberg, McGuinness & Alt, LLC
Ingrid A. Alt
  *Durango, Colorado*

**CHIEF JUSTICE RICE** delivered the Opinion of the Court.

¶1 This interlocutory appeal requires us to answer whether a defendant's confession to an Army investigator during basic training was the product of coercion. We hold that, when a defendant knowingly and intelligently waived his Miranda rights, knew he was free to leave an interview, and confessed to committing a crime during the course of a conversational, friendly interview devoid of coercive promises or threats, he gave his statements voluntarily. We therefore reverse the trial court's suppression order and remand for proceedings consistent with this opinion.

## I. Facts and Procedural History

¶2 In the fall of 2015, the victim, F.G.—age thirteen at the time—told the La Plata County Sheriff's Office that seven years prior, the defendant, Z.T., had forced her to give him oral sex on several occasions at BMX bicycle races. At the time of the alleged assaults, F.G. was six and Z.T. was thirteen. Z.T., at the time that F.G. made the allegations in 2015, was in Army basic training at Fort Benning, Georgia. A La Plata County sheriff's deputy formally requested that Agent Kevin Kendall of the Army's Criminal Investigations Division ("CID") at Fort Benning interview Z.T. about F.G.'s allegations.

¶3 Z.T.'s commanding officer escorted him to the interview. Agent Kendall advised Z.T. of his Miranda rights and that the interview concerned allegations of a "child sex assault." Initially, Z.T. invoked his right to an attorney and Agent Kendall said, "I'll let your command know and they're going to come pick you up, and then . . . whatever you want to do from there is pretty much the gist of it." Z.T. then decided to revoke his

2

request for counsel and agreed to proceed without counsel. Z.T. signed a waiver to that effect. Agent Kendall then spoke with Z.T. for nine hours.

¶4 For the first three hours of the interview, Agent Kendall and Z.T. discussed Z.T.'s childhood, family, friends, experiences racing BMX bicycles, and sexual history. When asked if he knew why he was being interviewed, Z.T. stated that he did not know. Almost three hours into the interview, Agent Kendall told Z.T. that F.G. was his accuser and what F.G. had accused him of, and Z.T. denied ever touching F.G. inappropriately. Agent Kendall rejected his denials with statements such as, "This isn't going to go away," "There has to be more than that," and "These allegations are very specific, and kids don't just make this stuff up." Agent Kendall then began invoking Z.T.'s military career, stating:

> We don't want this to . . . we don't want it to affect your military career or affect your life at all . . . help us understand what's going on . . . why she would feel this way.
>
> . . . .
>
> The quicker we find out the truth, you know, the faster we'll be able to take care of this and get it wrapped up so that way it's not affecting your career. . . . Okay, because I don't want this to affect your career. . . . I don't want this to be hanging over you for the rest of your life. . . . You know, mistakes happen . . . and people do things, and they regret it later. They're like, crap, I shouldn't have done that . . . the kid, you know, steals a candy bar . . . and the guy that accidentally kisses a girl and maybe she didn't want to be kissed.

¶5 After a long pause, Z.T. admitted to inappropriate sexual contact with F.G. Specifically, Z.T. admitted to masturbating with F.G. on his lap during a game of hide and seek. Agent Kendall and Z.T. then discussed Z.T.'s strong religious upbringing,

and Z.T. described the overwhelming guilt he felt from the improper sexual contact with F.G. Z.T. then also admitted to other instances of improper sexual contact with F.G., including oral sex, and discussed how guilty these other acts made him feel. Afterward, Z.T. told Agent Kendall that he would not have been honest with a more aggressive interrogator, and thanked him, stating:

> I honestly don't think if I had someone who was, all right, you did it, what's going on, what'd you do, where, why? Sir, I would have locked up. I don't think I could have truthfully completed everything being hounded like that sir. So I guess I'm trying to say thank you for being understanding.

¶6 At the end of the interview, Z.T. swore that he freely gave his statements and read aloud the following:

> I, [Z.T.], have read or have had read to me this statement which begins on page one and ends on page four. I fully understand the contents of the entire statement made by me. I have initialed the bottom of each page containing the statement. I've made this statement freely without hope of benefit or reward, without threat of punishment, and without coercion, unlawful influence, or unlawful inducement.

Agent Kendall asked Z.T. if he knew what that meant, and Z.T. said, "Yes sir, no one forced me or said it would be better or worse for me to do this." Finally, Agent Kendall asked, "Do you swear at this time, do you swear, this whole statement is the truth?" Z.T. answered, "I swear that this statement is the truth."

¶7 The prosecution then charged Z.T. with sexual assault on a child. Z.T. waived his right to contest extradition and was transported to Colorado to stand trial. In August 2016, Z.T.'s defense counsel successfully moved to suppress his confessions. In suppressing Z.T.'s confessions, the trial court concluded that Agent Kendall had

4

engaged in coercive conduct that played a significant role in inducing Z.T.'s confessions, particularly Agent Kendall's promises of leniency. However, the trial court also held that Z.T. (1) was not in custody at the time of his confessions; (2) knowingly and intelligently waived his Miranda rights; (3) initiated further communication with Agent Kendall after he had invoked his right to counsel; and (4) made a second knowing and intelligent waiver of his Miranda rights.

¶8    The prosecution filed a timely interlocutory appeal pursuant to section 16-12-202(2), C.R.S. (2016), and C.A.R. 4.1. We now reverse the trial court's suppression order and remand for proceedings consistent with this opinion.

## II. Analysis

¶9    The prosecution argues that the trial court improperly suppressed Z.T.'s confessions because Agent Kendall never engaged in coercive behavior and that Z.T.'s confessions were voluntary. We agree.

¶10    "A trial court's suppression order presents a mixed question of law and fact." People v. McIntyre, 2014 CO 39, ¶ 13, 325 P.3d 583, 586. We defer to a trial court's findings of historical fact that are supported by competent evidence, but we review the legal effect of those facts de novo. Id., 325 P.3d at 587.

¶11    For a defendant's confession to be admissible, he must have made it voluntarily. Id. at ¶ 15, 325 P.3d at 587. "If the defendant makes a prima facie showing of involuntariness at a suppression hearing, the prosecution then bears the burden of establishing by a preponderance of the evidence that he in fact made the statements voluntarily." Id.; accord Prima Facie, Black's Law Dictionary (10th ed. 2014) (stating

that a prima facie showing is one that is "[s]ufficient to establish a fact or raise a presumption unless disproved or rebutted").

¶12 To determine whether a defendant made voluntary statements, we consider the totality of the circumstances surrounding the statements, "particularly 'the significant details surrounding and inhering' in the questioning." McIntyre, ¶ 16, 325 P.3d at 587 (quoting People v. Ramadon, 2013 CO 68, ¶ 20, 314 P.3d 836, 842). A defendant's statements are involuntary when an officer's behavior was "coercive so as to overbear the defendant's will in making the statements." Id. (quoting People v. Zadran, 2013 CO 69M, ¶ 10, 314 P.3d 830, 833). "The existence of coercion alone, however, does not automatically nullify the voluntariness of a defendant's statements and make them inadmissible." Id. "Instead, in order to justify suppression, 'the coercive police conduct must have played a significant role in inducing the statement[s].'" Id. (alterations in original) (quoting Zadran, ¶ 10, 314 P.3d at 833).

¶13 In evaluating the coerciveness of the police's conduct, we examine "both the defendant's ability to resist coercive pressures and the nature of the police conduct." Ramadon, ¶ 20, 314 P.3d at 842. Specifically, we consider the following non-exhaustive list of factors:

1. whether the defendant was in custody;
2. whether the defendant was free to leave;
3. whether the defendant was aware of the situation;
4. whether the police read Miranda rights to the defendant;
5. whether the defendant understood and waived Miranda rights;
6. whether the defendant had an opportunity to confer with counsel or anyone else prior to or during the interrogation;
7. whether the statement was made during the interrogation or volunteered later;

8. whether the police threatened [the] defendant or promised anything directly or impliedly;

9. the method [or style] of the interrogation;

10. the defendant's mental and physical condition just prior to the interrogation;

11. the length of the interrogation;

12. the location of the interrogation; and

13. the physical conditions of the location where the interrogation occurred.

McIntyre, ¶ 17, 325 P.3d at 587 (alterations in original).

¶14   Here, the first six factors favor a finding of voluntariness: (1) Z.T. was not in custody; (2) Z.T. was free to leave the interview and have his commanding officer pick him up; (3) Z.T. was told he was there because of sexual assault allegations; (4) Z.T. was told of his Miranda rights; (5) Z.T. knowingly and intelligently waived his Miranda rights; and (6) Z.T. had the opportunity to obtain and confer with counsel but declined to do so.  As to the seventh factor, Z.T. confessed during the interrogation, but that by itself is not necessarily indicative of coercion.  On the eighth factor, Agent Kendall made vague references to his hopes that this incident would not affect Z.T.'s career, but Agent Kendall never made any overt promises to help Z.T. or any promises that by confessing, Z.T. would be allowed to complete basic training and remain in the Army.  As to the ninth factor, the interview was conversational and friendly.  Further, Z.T.'s statements thanking Agent Kendall for the way in which he conducted the interview support the conclusion that Agent Kendall did not use coercive methods.

¶15   The final four factors support finding a coercive environment, because the interview lasted nine hours on an Army base during basic training.  But there is no indication in the record or in the recording of the interview that these factors somehow

7

contributed to coercing Z.T. to confess.  Rather, the conversational tone and honest conversation, coupled with Z.T.'s discussion of his religious upbringing and statements of guilt, suggest that Z.T. made these statements of his own free will.  Z.T. even thanked Agent Kendall at the end of his interview for helping him tell the truth, saying, "[T]hank you for being understanding."  Therefore, we hold that Agent Kendall did not engage in coercive behavior, and Z.T. gave his confessions voluntarily.

### III.  Conclusion

¶16     We reverse the trial court's suppression order and remand for proceedings consistent with this opinion.