1
 2025 CO 20 The People of the State of Colorado, Plaintiff-Appellant: v. Patrick Nkongolo. Defendant-Appellee: No. 24SA333
Supreme Court of Colorado, En Banc
May 12, 2025
 
          
 Arapahoe County District Court Case No. 24CR53 Honorable
 David N. Karpel, Judge
 
 
          
 Attorneys for Plaintiff-Appellant:
 
 
           Amy L.
 Padden, District Attorney, Eighteenth Judicial District
 
 
           Laura
 Wood, Deputy District Attorney
 
 
          
 Centennial, Colorado
 
 
          
 Attorneys for Defendant-Appellee:
 
 
           Tucker
 Grosgebauer, P.C.
 
 
           Grant
 W. Grosgebauer
 
 
           Jason
 C. Fisher
 
 
          
 Denver, Colorado
 
 
          
 JUSTICE HOOD delivered the Opinion of the Court, in which
 CHIEF JUSTICE MARQUEZ, JUSTICE BOATRIGHT, JUSTICE GABRIEL,
 JUSTICE HART, JUSTICE SAMOUR, and JUSTICE BERKENKOTTER
 joined.
 
 2
 
          
 OPINION
 
 
           HOOD
 JUSTICE
 
 
          ¶1
 Defendant, Patrick Nkongolo, has been charged with multiple
 counts of sexual assault on a child, A.K., as a pattern of
 abuse. In this interlocutory appeal, the prosecution
 challenges the trial court's pretrial order, which
 suppressed a textmessage conversation between Nkongolo and
 A.K.'s father, D.K., that occurred on November 15, 2023.
 The trial court concluded that the statements Nkongolo made
 during that conversation were the product of police coercion,
 which rendered them involuntary and inadmissible at trial.
 
 
          ¶2
 D.K. initiated the conversation at the behest of law
 enforcement, and a police officer guided D.K. through the
 questioning. So, it's undisputed that D.K. acted as an
 agent of the police during the November 15 conversation. We
 conclude, however, that D.K.'s conduct wasn't
 coercive. And even if it had been, this alleged coercion
 didn't play a significant role in inducing Nkongolo's
 side of the text exchange. Consequently, we reverse the
 portion of the trial court's order that suppressed
 Nkongolo's November 15 statements.
 
 
          I.
 Facts and Procedural History
 
 
          ¶3
 In 2023, A.K. told a therapist that Nkongolo had repeatedly
 sexually assaulted her over the previous three years,
 beginning when she was eleven years old. A.K. referred to
 Nkongolo as her uncle, even though they are not related, and
 explained that he was a close family friend who had lived
 with her family for
 
 3
 
 several years. The therapist reported the outcry to Arapahoe
 County Human Services ("ACHS"), and a case worker
 at ACHS reported it to the police.
 
 
          ¶4
 As part of the police investigation into the allegations, the
 investigating officer asked D.K. to initiate a "pretext
 conversation" with Nkongolo by text message. As the
 officer later explained at the pretrial hearing, a pretext
 conversation is "an investigative tool, to see how a
 suspect is going to respond to involved parties in the
 case." The officer testified that she told D.K. ahead of
 time what type of messages she wanted him to send, and during
 the conversation, she made suggestions to D.K. about what to
 say and, more specifically, what questions to ask.
 
 
          ¶5
 D.K.'s first attempt at the pretext conversation on
 November 2 was unsuccessful. Nkongolo sent D.K. a message a
 few days later, on November 7, but D.K. said he couldn't
 talk. Finally, on November 15, the pretext conversation at
 issue occurred.[1]
 
 
          ¶6
 At the beginning of the conversation, D.K. told Nkongolo that
 he wanted to talk about what had happened with A.K. He then
 told Nkongolo, "[Y]ou are a
 
 4
 
 member of the family, you must tell me sincerely that it is
 happening to see what we can do." D.K. let Nkongolo know
 that A.K. had already spoken to him, but said he wanted to
 hear from Nkongolo. Nkongolo downplayed what had occurred,
 explaining it involved nothing more than hugs and jokes. But
 D.K. said that didn't align with what A.K. had told him
 and that he "need[ed] the truth to see what we can do to
 keep this in the family." When Nkongolo again said it
 was just a hug, D.K. confronted him with A.K.'s
 accusation that Nkongolo had put his "mouth [o]n her
 breasts." Nkongolo's version remained the same.
 Although, during this conversation, Nkongolo never explicitly
 admitted to any unlawful sexual contact, he eventually
 apologized for upsetting A.K. and admitted to giving her
 "a little friendly kiss" when she hugged him.
 
 
          ¶7
 D.K. asked Nkongolo several more times whether he had kissed
 A.K.'s breasts, imploring Nkongolo to be honest, but
 Nkongolo never confirmed or denied that allegation. Finally,
 D.K. ended the conversation by saying, "I wanted this to
 be dealt with in the family but apparently you don't want
 to so I'm going to do what [my wife] wants us to
 do."
 
 
          ¶8
 The prosecution subsequently charged Nkongolo with five
 counts of sexual assault on a child as a pattern of abuse.
 Before trial, Nkongolo moved to suppress all three of the
 November text exchanges.
 
 5
 
          ¶9
 At the hearing on the motion, the trial court heard testimony
 from the investigating officer and reviewed the text
 messages. It then concluded that the statements Nkongolo made
 on the first two dates, November 2 and 7, were voluntary and
 admissible, and it denied suppression of those statements.
 
 
          ¶10
 The trial court also concluded, however, that the prosecution
 had failed to show by a preponderance of the evidence that
 the November 15 statements were voluntary. The court found
 that D.K.'s repeated assertions that he wanted to
 "keep this in the family" were implied promises
 that D.K. wouldn't go to the police if Nkongolo confessed
 to what he'd done. The court found that these repeated
 implied promises were coercive and that the totality of the
 circumstances overbore Nkongolo's will, rendering his
 statements involuntary. So, the court granted Nkongolo's
 motion to suppress those statements.
 
 
          ¶11
 The prosecution now appeals that ruling.
 
 
          II.
 Jurisdiction and Standards of Review
 
 
          ¶12
 We may consider an interlocutory appeal filed by the
 prosecution, seeking relief from a trial court's
 suppression order. § 16-12-102(2), C.R.S. (2024); C.A.R.
 4.1(a); People v. Brown, 2022 CO 11, ¶ 13, 504
 P.3d 970, 974.
 
 
          ¶13
 Because a suppression ruling presents a mixed question of law
 and fact, we "defer to the trial court's findings of
 historical fact, if supported by competent evidence in the
 record," but "we review the trial court's
 conclusions of law de
 
 6
 
 novo." Brown, ¶ 14, 504 P.3d at 975. So
 here, we defer to the trial court's factual findings
 regarding the circumstances surrounding Nkongolo and
 D.K.'s conversation, but we consider anew whether those
 circumstances rendered Nkongolo's statements involuntary.
 See People v. Matheny, 46 P.3d 453, 461-62 (Colo.
 2002); People v. McIntyre, 789 P.2d 1108, 1111
 (Colo. 1990).
 
 
          ¶14
 "If the defendant makes a prima facie showing of
 involuntariness at a suppression hearing, the prosecution
 then bears the burden of establishing by a preponderance of
 the evidence that he in fact made the statements
 voluntarily." People in Int. of Z.T.T., 2017 CO
 48, ¶ 11, 394 P.3d 700, 703 (quoting People v.
 McIntyre, 2014 CO 39, ¶ 15, 325 P.3d 583, 587). And
 although we must consider the totality of the circumstances,
 People v. Davis, 187 P.3d 562, 563-64 (Colo. 2008),
 on appeal "we look solely to the record created at the
 suppression hearing" to determine whether the trial
 court properly suppressed the evidence, People v.
 Thompson, 2021 CO 15, ¶ 16, 500 P.3d 1075, 1078.
 
 
          III.
 Analysis
 
 
          ¶15
 "Under the due process clauses of the United States and
 Colorado constitutions, a defendant's statements must be
 voluntary to be admissible as evidence." People v.
 Ramadon, 2013 CO 68, ¶ 18, 314 P.3d 836, 841;
 see also U.S. Const. amends. V, XIV; Colo. Const.
 art. II, § 25. These constitutional requirements exist
 even if the defendant was not in custody when the statements
 were made.
 
 7
 
 People v. Medina, 25 P.3d 1216, 1225 (Colo. 2001);
 see also Colorado v. Connelly, 479 U.S. 157, 163-67
 (1986). This is to say nothing more remarkable than
 determining whether the safeguards established in Miranda
 v. Arizona, 384 U.S. 436 (1966), apply and were followed
 and determining whether a statement was voluntary are
 different analyses, even though the relevant legal
 considerations are intertwined. As a result, even though a
 statement by phone doesn't constitute custodial
 interrogation, People v. Platt, 81 P.3d 1060, 1066
 (2004), the trial court was still obligated to address the
 voluntariness of Nkongolo's statements, see id.
 ("Statements and confessions received as a result of a
 non-custodial interrogation are admissible, if they are
 voluntary.").
 
 
          ¶16
 "To be voluntary, a statement must be the product of an
 essentially free and unconstrained choice by its maker."
 Ramadon, ¶ 19, 314 P.3d at 842. A
 defendant's statements are therefore involuntary if an
 officer's coercive conduct played a significant role in
 overbearing the defendant's will and inducing the
 statements. Z.T.T., ¶ 12, 394 P.3d at 703.
 
 
          ¶17
 Thus, an involuntary statement has three attributes. First,
 we must identify some form of governmental coercion.
 Blum v. Yaretsky, 457 U.S. 991, 1004 (1982); see
 also Connelly, 479 U.S. at 166 ("The most
 outrageous behavior by a private party seeking to secure
 evidence against a defendant does not make that evidence
 inadmissible under the Due Process Clause."). State
 action may seem obvious
 
 8
 
 when the allegedly coercive actors are uniformed police
 officers but less so when law enforcement uses a private
 party to interrogate a suspect.
 
 
          ¶18
 Second, we consider whether the state actor's conduct was
 actually coercive; meaning, sufficiently forceful to
 implicate constitutional limits on governmental
 interrogation. Connelly, 479 U.S. at 167. Coercive
 conduct may include physical abuse or threats as well as more
 "subtle forms of psychological coercion."
 Effland v. People, 240 P.3d 868, 877 (Colo. 2010).
 But context is king. So, "we examine 'both the
 defendant's ability to resist coercive pressures and the
 nature of the police conduct.'" Z.T.T.,
 ¶ 13, 394 P.3d at 703 (quoting Ramadon, ¶
 20, 314 P.3d at 842). The following non-exhaustive list of
 factors helps guide this determination:
 
 
 1. whether the defendant was in custody;
 
 
 2. whether the defendant was free to leave;
 
 
 3. whether the defendant was aware of the situation;
 
 
 4. whether the police read Miranda rights to the
 defendant;
 
 
 5. whether the defendant understood and waived
 Miranda rights;
 
 
 6. whether the defendant had an opportunity to confer with
 counsel or anyone else prior to or during the interrogation;
 
 
 7. whether the statement was made during the interrogation or
 volunteered later;
 
 
 8. whether the police threatened [the] defendant or promised
 anything directly or impliedly;
 
 9
 
 9. the method [or style] of the interrogation;
 
 
 10. the defendant's mental and physical condition just
 prior to the interrogation;
 
 
 11. the length of the interrogation;
 
 
 12. the location of the interrogation; and
 
 
 13. the physical conditions of the location where the
 interrogation occurred.
 
 
 Id. (alterations in original) (quoting
 McIntyre, ¶ 17, 325 P.3d at 587).
 
 
          ¶19
 Third, even if the conduct was coercive, a final step
 remains. Id. at ¶ 12, 394 P.3d at 703. For us
 to conclude that a defendant's statement was involuntary,
 we must determine that coercive police conduct played a
 "significant role" in inducing it. Id.
 
 
          ¶20
 With these legal concepts in mind, we return to the case at
 hand.
 
 
          A.
 Government Actor
 
 
          ¶21
 Because D.K. was not a police officer, we must first
 determine whether he was acting as an agent of the government
 in eliciting Nkongolo's statements. We begin by
 considering "(1) whether the government
 'encourage[d], initiate[d], or instigate[d] the private
 action,' and (2) whether 'the party performing the
 [interrogation] intended to assist law enforcement efforts or
 to further his own ends.'" People v.
 Pilkington, 156 P.3d 477, 479 (Colo. 2007) (first three
 alterations in original) (quoting United States v.
 Smythe, 84 F.3d 1240, 1242-43 (10th Cir. 1996)).
 
 10
 
          ¶22
 Here, D.K. contacted Nkongolo at law enforcement's
 behest, and an officer told D.K. which questions to ask. The
 trial court found that D.K. was an agent of the police, and
 neither party disputes this finding.
 
 
          B.
 Coercive Conduct
 
 
          ¶23
 Next, we must consider whether D.K.'s conduct was
 coercive. We examine coercion from the suspect's
 perspective. Illinois v. Perkins, 496 U.S. 292, 296
 (1990).
 
 
          ¶24
 We recognize that the "police-dominated atmosphere"
 of a prototypical custodial interrogation generates
 "inherently compelling pressures which work to undermine
 the individual's will to resist and to compel him to
 speak where he would not otherwise do so freely."
 Id. (quoting Miranda, 384 U.S. at 445,
 467); accord Matheny, 46 P.3d at 462-63. But these
 "inherently compelling pressures" are missing when
 an individual speaks to a friend; that is, when an individual
 doesn't know he is speaking with the police.
 Perkins, 496 U.S. at 296-97 (quoting
 Miranda, 384 U.S. at 467). Therefore, it isn't
 inherently coercive for police officers to use an agent, like
 D.K., to try to get a suspect to speak. See id. at
 297 (explaining that "mere strategic deception by taking
 advantage of a suspect's misplaced trust" in someone
 the suspect doesn't know is an agent of the police
 doesn't offend due process). Accordingly, we must
 consider the totality of the circumstances and the remaining
 factors to determine whether Nkongolo's statements were
 voluntary.
 
 11
 
          ¶25
 First, Nkongolo wasn't in custody during the November 15
 conversation. Although D.K.'s questions constituted an
 interrogation, see Rhode Island v. Innis, 446 U.S.
 291, 301 (1980), Nkongolo wasn't subjected to a
 custodial interrogation. Thus, he wasn't
 entitled to a Miranda warning. See People v.
 Wakefield, 2018 COA 37, ¶ 47, 428 P.3d 639, 649.
 These circumstances therefore weigh against a finding of
 coercion. See Effland, 240 P.3d at 874.
 
 
          ¶26
 Second, Nkongolo arguably had the opportunity to speak with
 an attorney before this conversation but chose not to. He
 told D.K. that he had received a letter from ACHS with a
 number he could call, but he wanted to speak with D.K. first.
 As the trial court observed, however, it's unclear that
 Nkongolo knew he could speak with an attorney or even that he
 might want to. So, this factor doesn't tilt the scales
 one way or the other.
 
 
          ¶27
 Third, we note that the nature of the conversation-text
 messaging-weighs strongly against coercion. See People v.
 Munoz-Diaz, 2023 COA 105, ¶ 15, 543 P.3d 402, 406.
 Nkongolo could choose the timing, his location, and the
 duration of the conversation. He could also choose to respond
 or to stop responding at any time. And nothing about these
 messages indicates that Nkongolo was mentally or physically
 impaired.
 
 
          ¶28
 Lastly, D.K. told Nkongolo at the beginning of the
 conversation that he wanted to talk about what had happened
 with A.K., so Nkongolo was aware of
 
 12
 
 the situation. D.K. also said A.K. had told him what
 happened, but he wanted to hear it from Nkongolo so they
 could "see what we can do." D.K. repeatedly said
 that he wanted Nkongolo to be truthful and that he wanted
 "to keep this in the family." After Nkongolo failed
 to answer D.K.'s questions about whether he had kissed
 A.K.'s breasts, D.K. ended the conversation by saying,
 "I wanted this to be dealt with in the family but
 apparently you don't want to so I'm going to do what
 [my wife] wants us to do."
 
 
          ¶29
 The trial court found that D.K.'s statements about
 wanting "to keep this in the family" were implied
 promises that if Nkongolo told D.K. the truth, D.K.
 wouldn't go to the police. Because the record supports
 this finding, we defer to it. We disagree, however, with the
 trial court's legal conclusion that these circumstances
 were coercive.
 
 
          ¶30
 We generally don't consider it coercive for law
 enforcement officers to tell a suspect the factual
 allegations against him. People v. Cerda, 2024 CO
 49, ¶ ¶ 42-43, 559 P.3d 206, 215. Nor do we
 generally consider it coercive for law enforcement officers
 to tell a suspect the possible consequences that may result
 from his decision to speak or to remain silent. People v.
 Smiley, 2023 CO 36, ¶ 39, 530 P.3d 639, 649;
 see also 2 Wayne R. LaFave et al., Criminal
 Procedure § 6.2(c) n.100, Westlaw (4th ed. database
 updated Nov. 2024) ("[A] mere threat to take action
 which would be lawful and necessary absent cooperation is not
 objectionable."); United States v. Perez,
 
 13
 
 127 F.4th 146, 173 (10th Cir. 2025) (explaining that courts
 generally don't consider it coercive to accurately
 explain the reality of a suspect's situation and the
 consequences of cooperation versus silence). And "[t]he
 practice of encouraging a suspect to be honest is
 well-established . . . as noncoercive conduct."
 United States v. Pena, 115 F.4th 1254, 1263 (10th
 Cir. 2024); see also People v. Miranda-Olivas, 41
 P.3d 658, 662-63 (Colo. 2001).
 
 
          ¶31
 Therefore, considering the totality of the circumstances
 surrounding the November 15 conversation, we conclude that
 the prosecution failed to prove that D.K.'s conduct was
 coercive. See Z.T.T., ¶¶ 14-15, 394 P.3d
 at 703-04; Munoz-Diaz, ¶¶ 15-21, 543 P.3d
 at 406-07.
 
 
          C.
 Significant Factor
 
 
          ¶32
 Finally, even if D.K.'s conduct had been coercive, we
 would still need to determine whether this conduct played a
 significant role in inducing Nkongolo's statements. The
 trial court concluded that D.K.'s implied promises not to
 go to the police, combined with "the fact that it's
 unknown whether . . . Nkongolo[] was aware of the
 situation" because the contents of the letter from ACHS
 weren't in the record, were circumstances that played a
 significant role in overbearing Nkongolo's will.
 Accordingly, the court concluded Nkongolo's statements
 were involuntary. We disagree.
 
 14
 
          ¶33
 An officer's repeated exhortations for a suspect to be
 honest don't necessarily overbear a defendant's free
 will. See Pena, 115 F.4th at 1264. Similarly, an
 officer may generally "make a truthful statement
 regarding a possible punishment without it overbearing a
 defendant's will," Dowell v. Lincoln Cnty.,
 762 F.3d 770, 776 (8th Cir. 2014), as long as the officer
 isn't intentionally exploiting a suspect's known
 weaknesses with such statements, see Ramadon,
 ¶¶ 24-28, 314 P.3d at 844-45.
 
 
          ¶34
 Here, there is no evidence that Nkongolo was particularly
 vulnerable to D.K.'s implied promises that he would keep
 the situation in the family and not involve the police if
 Nkongolo told him the truth or that these promises were an
 attempt to exploit some weakness. And Nkongolo never changed
 his story, maintaining throughout the conversation that he
 had just been joking around. So, it's clear that neither
 D.K.'s implied promises, nor the circumstances as a
 whole, overbore Nkongolo's will or induced him to speak.
 Cf. People v. Springsted, 2016 COA 188, ¶¶
 34-49, 410 P.3d 702, 712-15 (concluding that the coercive
 environment created by the officers played a significant role
 in overbearing the defendant's will, as evidenced, in
 part, by the fact that the defendant changed his story as the
 coercive tactics mounted).
 
 
          ¶35
 We therefore conclude that Nkongolo's statements were
 voluntary.
 
 15
 
          IV.
 Conclusion
 
 
          ¶36
 We reverse the portion of the trial court's order
 suppressing the November 15 statements, and we remand the
 case to the trial court for further proceedings.
 
 
 ---------
 
 
 Notes:
 
 
 [1] Nkongolo and D.K. are originally from
 the Democratic Republic of the Congo and primarily speak
 Tshiluba. In text messages, however, they typically use
 French. The investigating officer had the transcripts of the
 three relevant text exchanges translated from French to
 English, which the court admitted into evidence at the
 suppression hearing. We rely on that translation in this
 opinion.
 
 
 ---------