23CA0798 Peo v Sanchez 01-15-2026

COLORADO COURT OF APPEALS

Court of Appeals No. 23CA0798
Adams County District Court No. 22CR1589
Honorable Patrick H. Pugh, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Joshua Larry Sanchez,

Defendant-Appellant.

JUDGMENT AFFIRMED

Division VII
Opinion by JUDGE MOULTRIE
Tow and Lum, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced January 15, 2026

Philip J. Weiser, Attorney General, Caitlin E. Grant, Assistant Attorney
General, Megan Ryan Machak, Assistant Attorney General Fellow, Denver,
Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Madeline Dobkin, Deputy State
Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1    Defendant, Joshua Larry Sanchez, appeals the judgment of conviction entered on a jury verdict finding him guilty of second degree burglary, theft, and possession of an illegal weapon. We affirm.

## I.    Background

¶ 2    The following factual background reflects evidence the jury heard at trial.

¶ 3    On May 18, 2022, Tiffany Gonzales arrived home in the middle of the day and heard noises coming from the basement. Gonzales thought the noises might have been from her stepfather, with whom she lived, and she called out to see if he was home before she realized he was already at work. Gonzales then saw an unknown man walk up the basement stairs, grab a black backpack, and exit the house into the backyard. After the man jumped a gate in the backyard, Gonzales got in her car to follow him. While driving behind the man, Gonzales called 911 to report the incident. She followed the man down the street until he jumped over a fence and appeared to enter a backyard. Gonzales returned home to meet with sheriff's deputies who were responding to her 911 call.

¶4     Deputy Alexander Lofgren walked through Gonzales's home with her to see if anything had been stolen.  While Deputy Lofgren was conducting the walk-through with Gonzales, other deputies searched the neighborhood but didn't find or arrest anyone in connection with the burglary.

¶5     During the walk-through, Gonzales noticed that each floor of her home had drawers open, papers on the floor, and "things . . . not the way [she] left them."  Gonzales also saw two bags near the garage door that contained items from throughout her home — electronics, an old ID, money, and cords.  Gonzales stated that the bags weren't there when she left her house earlier that day.  Although Gonzales didn't report any items missing at that time, about a week later she noticed her spare car key and two charm bracelets were missing.  She called the sheriff's office to report the missing items.

¶6     One week after the burglary, Gonzales was outside her home speaking with a neighbor about the burglary when she saw a man walk down the street and enter a house.  She believed that the man was the same person whom she had seen the prior week in her home, so she called 911.

¶ 7    After deputies arrived at Gonzales's residence, a couple of deputies went to the house that Gonzales had seen the man enter. As deputies approached that house, they saw the man walking down the driveway. The man matched the description that Gonzales had provided, so deputies detained him for investigative purposes.

¶ 8    Deputy Jared Cantor remained with Gonzales while the other deputies contacted the man. After the other deputies detained the man, and before the show-up identification procedure began, Deputy Cantor read Gonzales the six admonitions required under section 16-1-110(3)(d)(I)(A)-(F), C.R.S. 2025.

¶ 9    The deputies who had detained the man described that they took the man out of handcuffs, walked him away from their patrol cars, and stepped about ten feet away from the man so that Gonzales would have a clear view of him. Deputy Cantor then drove Gonzales past the man in his patrol car and asked her if she could identify him. Gonzales twice confirmed to Deputy Cantor that she was "100% confident" that the man with the other deputies was the same man whom she had seen in her home on May 18.

¶ 10    Deputies arrested the man, who was later identified as Sanchez, and placed him into custody.  The deputies also took Sanchez's backpack and processed the contents, which contained brass knuckles.  Ultimately, the prosecution filed a complaint charging Sanchez with second degree burglary, theft, and possession of an illegal weapon.

## II.    Procedural History

¶ 11    Sanchez filed a motion to suppress Gonzales's identification of him, asserting that the show-up identification procedure was impermissibly suggestive and violated his right to due process.  The district court held a hearing and concluded that the show-up identification wasn't "so impermissibly suggestive or extremely unfair that it should be excluded as a violation of due process rights."  The court thus denied the motion to suppress.

¶ 12    The day before trial, Sanchez sought to sever the possession of an illegal weapon charge from the other charges.  Sanchez argued in the alternative that the court should bifurcate the trial.  The court denied the motion.

¶ 13    A jury found Sanchez guilty of all three charges.  Sanchez appeals his judgment of conviction, asserting that the court erred

by admitting evidence of the show-up identification and denying his motion to sever or bifurcate the weapon charge from the other two charges.  Sanchez also challenges the sufficiency of the evidence for the theft conviction.

## III.   The Show-Up Identification Wasn't Impermissibly Suggestive

### A.   Additional Background

¶ 14    Defense counsel called Deputy Cantor as a witness at the suppression hearing to testify about the show-up identification procedure that the deputies conducted on May 25.  Deputy Cantor testified that he carries a show-up identification procedure card, which lists six admonitions to be given to witnesses on one side and the sheriff's office's policies on the other side.

¶ 15    One of the policies listed on the card says, "The officer shall photograph or video the subject and the show-up location at the time of that identification.  If there is a body cam, the entire procedure shall be recorded, including admonition given to the witness."  Deputy Cantor testified that he didn't record the show-up procedure "due to safety reasons" because "[he wasn't] going to drive and hold a camera."  He also testified that the sheriff's office

didn't receive body worn cameras until several months after the show-up identification that occurred in this case.

¶ 16    Deputy Cantor, describing the circumstances of the show-up identification, said that Gonzales sat in the back of his patrol car while he slowly drove past Sanchez, who was standing at the edge of the curb by himself, unhandcuffed.  He said that deputies were standing to the right side of Sanchez, about ten feet away from him. Deputy Cantor couldn't remember where Sanchez's backpack was. He also couldn't remember where the other deputies' patrol cars were, but he did recall that the cars weren't close to Sanchez and didn't obstruct Gonzales's view.  And he confirmed that the identification occurred during the middle of the day, sometime before 3 p.m.

¶ 17    During the suppression hearing, defense counsel argued that, because deputies stood ten feet away from Sanchez during the identification, patrol cars were present, and the backpack "was within the area," the show-up identification procedure was suggestive, even if officers didn't intend it to be so.

¶ 18    Defense counsel further argued that none of the deputies recorded the procedure, despite having at least one camera on

scene capable of recording, which was a violation of their sheriff's office's policies. Defense counsel then argued that "[the deputies] had the opportunity to use various other forms to do the identification," and "[t]hey knew exactly where [Sanchez] lived," but "they chose to do their . . . show-up this way."

¶ 19 The court found that the facts favoring the conclusion that the show-up procedure was suggestive were (1) Sanchez was the only person standing next to deputies and their patrol cars; and (2) the identification occurred at a location different from where Gonzales, on May 18, had seen the man who burglarized her home enter a backyard. Conversely, the court found that the following facts weighed against the procedure being suggestive:

- Sanchez wasn't in handcuffs.

- Although deputies were present, they were approximately ten feet away from Sanchez.

- Deputy Cantor admonished Gonzales that the person — Sanchez — may not be the offender and that it "[was] just as important to determine whether [the] person [was] not the offender."

- Deputies didn't ask Sanchez to place his braided hair within his T-shirt as Gonzales had described seeing during the burglary.

Based on these findings, the court concluded that the show-up identification procedure wasn't "so impermissibly suggestive as to be unreliable."

## B. Applicable Legal Principles

¶ 20 A show-up identification is a "procedure in which an eyewitness is presented with a single subject in person for the purpose of determining whether the eyewitness identifies the individual as the suspect." § 16-1-110(1)(b). While "[o]ne-on-one showups are not per se violative of due process, . . . the procedure is viewed with disfavor because of its strong potential for unnecessary suggestiveness." *People v. Mascarenas*, 666 P.2d 101, 109 (Colo. 1983); *accord People v. Martinez*, 2015 COA 37, ¶ 11.

¶ 21 A court violates a defendant's constitutional right to due process if it allows a jury to consider evidence of an unreliable identification. *See People v. Borghesi*, 66 P.3d 93, 103 (Colo. 2003). When a defendant challenges a pretrial identification, the court must conduct a two-step analysis. *People v. Williams*, 2019 COA

32, ¶ 7.  First, the defendant must demonstrate to the court that the identification procedure was impermissibly suggestive.  *Id.* at ¶ 8.  Impermissibly suggestive identification procedures are those that are "so unnecessarily suggestive as to render the identification unreliable."  *Martinez*, ¶ 11; *see Perry v. New Hampshire*, 565 U.S. 228, 238-39 (2012) ("[D]ue process concerns arise only when law enforcement officers use an identification procedure that is both suggestive and unnecessary.").  "A claim that identification procedures were impermissibly suggestive must be evaluated in light of the totality of the surrounding circumstances."  *People v. Horne*, 619 P.2d 53, 56 (Colo. 1980).

¶ 22     If the defendant demonstrates the show-up identification procedure was impermissibly suggestive, then the burden shifts to the prosecution to prove that the identification is nevertheless reliable.  *Williams*, ¶ 7.  However, a court doesn't reach the second step if the defendant doesn't carry his burden on the first step.  *See Bernal v. People*, 44 P.3d 184, 191 (Colo. 2002) ("It is important to note that these two steps must be completed separately; it is only necessary to reach the second step if the court first determines that the [procedure] was impermissibly suggestive.").

¶ 23    The constitutionality of a pretrial identification procedure is a mixed question of fact and law. *Id.* at 190. We therefore defer to the district court's findings of fact if they're supported by the record but review the court's legal conclusions de novo. *Id.* Furthermore, "on appeal 'we look solely to the record created at the suppression hearing' to determine whether the trial court properly suppressed the evidence." *People v. Nkongolo*, 2025 CO 20, ¶ 14 (quoting *People v. Thompson*, 2021 CO 15, ¶ 16).

## C.    Analysis

¶ 24    As an initial matter, we disagree with the parties that Sanchez preserved the specific argument that the deputies' noncompliance with section 16-1-110 rendered the show-up procedure impermissibly suggestive. At the suppression hearing, defense counsel acknowledged that section 16-1-109(3), C.R.S. 2025, discusses the policies that law enforcement officers are supposed to implement for show-up identifications. But defense counsel didn't reference or present argument about section 16-1-110 in the motion to suppress or during the suppression hearing. That specific argument is therefore unpreserved, and we review the court's identification suppression determination for plain error. *See*

*Hagos v. People*, 2012 CO 63, ¶ 14; *see also* Crim. P. 52(b) ("Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court.").

¶ 25    "Plain error" is error that is both obvious and substantial. *Hagos*, ¶ 14.  An error is "obvious" when a trial judge should be able to avoid it without the benefit of an objection, *Romero v. People*, 2017 CO 37, ¶ 6, and includes an error that contravenes a clear statutory command, *People v. Kadell*, 2017 COA 124, ¶ 25.  But plain error requires reversal only if the error "so undermined the fundamental fairness of the trial itself as to cast serious doubt on the reliability of the judgment of conviction."  *People v. Crabtree*, 2024 CO 40M, ¶ 43 (quoting *Wilson v. People*, 743 P.2d 415, 420 (Colo. 1987)).  "In review for plain error, the defendant has the burden of persuasion with respect to prejudice."  *People v. Boykins*, 140 P.3d 87, 95 (Colo. App. 2005).

¶ 26    Section 16-1-110 limits law enforcement use of show-up identifications to specific circumstances.  One of those limited circumstances includes when an officer

> has detained a subject in [a] crime within
> minutes of the commission of the crime and
> near the location of the crime[,] . . . neither a

> live lineup nor photo array are available as a means of identification[,] and . . . [t]he eyewitness reasonably believes [they] can identify the subject.

§ 16-1-110(2)(a)(I)(A)-(C).

¶ 27     Sanchez argues that the show-up identification procedure here was impermissibly suggestive because the identification occurred a week after the burglary, rather than "within minutes" as required by section 16-1-110(2)(a)(I)(A).  We aren't persuaded.

¶ 28     A law enforcement officer's failure to comply with section 16-1-110's procedures doesn't render a particular show-up identification per se impermissibly suggestive.  Rather, an officer's failure to follow the statute's procedures becomes a factor the court must consider in determining *whether* a particular show-up identification was impermissibly suggestive.  *See* § 16-1-110(3)(b) ("The court shall consider any failure by law enforcement to comply with the requirements of this section with respect to any challenge to a showup identification.").

¶ 29     Here, the court received testimony that deputies didn't arrange a live lineup or photo array.  Although the court didn't reference section 16-1-110(3)(b) when making its findings, the court indicated

12

that it considered that testimony and the totality of the circumstances surrounding the show-up procedure — including the delay in time between the offense and Gonzales's identification of Sanchez — to determine whether the procedure violated due process. Assuming without deciding that this was insufficient to satisfy section 16-1-110(3)(b)'s requirement that the court "consider" the deputies' failure to follow the procedural requirements of section 16-1-110(2)(a)(I)(A), Sanchez hasn't demonstrated that such error by the court undermined the fairness of his trial or casts serious doubt on the reliability of his conviction.

¶ 30 By their nature, single person show-up identifications tend to be suggestive. *See Manson v. Brathwaite*, 432 U.S. 98, 134 (1977) (Marshall, J., dissenting) (the use of a single person in an identification procedure "dramatically suggests to the witness that the person . . . must be the culprit"). But they aren't per se invalid, *see Martinez,* ¶ 11, and we disagree with Sanchez that this particular show-up identification was *impermissibly* suggestive.

¶ 31 While the court found at the suppression hearing that some facts favored suggestiveness, the court also found that other facts disfavored the conclusion that the show-up identification procedure

was *impermissibly* suggestive. Specifically, the court found that the deputies stood ten feet away from Sanchez, didn't handcuff him during the procedure, didn't require Sanchez to place his braided hair inside his shirt, and appropriately admonished Gonzales before conducting the show-up identification. We defer to these record-supported findings. *See Bernal*, 44 P.3d at 190.

¶ 32 And contrary to Sanchez's assertion, Deputy Cantor's failure to record the show-up procedure doesn't establish that the procedure itself was impermissibly suggestive. Sanchez had the initial burden at the suppression hearing, but the record doesn't demonstrate that the deputies, in conducting the show-up procedure, aggravated the suggestiveness of the identification in any way. *See Johnson v. Dugger*, 817 F.2d 726, 729 (11th Cir. 1987) (concluding that the identification wasn't impermissible because the police didn't aggravate the suggestiveness).

¶ 33 Accordingly, we conclude that Sanchez didn't demonstrate that the show-up identification procedure was impermissibly suggestive. We therefore affirm the court's denial of his motion to suppress. *See Bernal*, 44 P.3d at 191.

## IV. The Court Didn't Abuse Its Discretion When It Denied Sanchez's Request to Sever or Bifurcate the Illegal Weapon Charge

### A. Additional Background

¶ 34  Sanchez had a backpack with him when deputies arrested him on May 25. The arresting deputy found a pair of brass knuckles in the front pocket of the backpack. Thus, the prosecution charged Sanchez with possession of an illegal weapon under section 18-12-102(4), C.R.S. 2025.

¶ 35  The court addressed Sanchez's motion to sever on the first day of trial, before jury selection began. The prosecution objected to severing the weapon charge, arguing that Sanchez had a presumption of innocence on all three charges and that trying the charges together wouldn't violate his right to due process. The court concluded that Sanchez hadn't established that he would suffer actual prejudice if the weapon charge was tried with the burglary and theft charges. The burglary-related charges didn't contain any allegations of the use of force or the use of a weapon, so the court concluded that there wasn't an inference that Sanchez committed burglary and theft because he allegedly possessed brass

15

knuckles.  The court also concluded that the jury would be able to separate the facts and legal principles applicable to each offense.

### B.    Applicable Legal Principles

¶ 36    Rule 8(a)(2) of the Colorado Rules of Criminal Procedure governs permissive joinder of offenses.  Permissive joinder allows the prosecution to charge a defendant with two or more offenses in the same complaint "if the offenses charged . . . are of the same or similar character or are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan."  Crim. P. 8(a)(2).

¶ 37    Conversely, Crim. P. 14 gives a district court discretion to sever offenses if either the defendant or the prosecution would be prejudiced by joinder of the offenses.  A defendant requesting severance under Rule 14 must demonstrate "that the joinder caused 'actual prejudice' and that the trier of fact was unable to separate the facts and legal principles applicable to each offense." *Bondsteel v. People*, 2019 CO 26, ¶ 59 (quoting *People v. Garcia*, 2012 COA 79, ¶ 28); *see also People v. Gregg*, 298 P.3d 983, 985–86 (Colo. App. 2011) (noting that reversal based on the consolidation of offenses is appropriate only if a defendant demonstrates actual

prejudice resulting from the jury's inability to separate the facts and legal theories applicable to each offense).

¶ 38 A defendant asserting that offenses were improperly joined must show that the counts are so "fundamentally and strikingly different" that the requirements of Rule 8(a)(2) aren't met. *Bondsteel*, ¶¶ 31, 42. To determine whether a defendant has met this burden, courts consider factors such as "the elements of the offenses at issue, the temporal proximity of the underlying acts, the likelihood that the evidence will overlap, the physical location of the acts, the modus operandi of the crimes, and the identity of the victims." *Id.* at ¶ 38.

¶ 39 We review a district court's decision whether to sever offenses for an abuse of discretion. *Washington v. People*, 2024 CO 26, ¶ 37. A court abuses its discretion when its decision is manifestly arbitrary, unreasonable, or unfair or based on an erroneous understanding or application of the law. *People v. McFee*, 2016 COA 97, ¶ 17. We apply a harmless error standard of reversal to a defendant's preserved claim of misjoinder of charges. *Washington*, ¶ 23.

## C. Analysis

¶ 40    As a threshold matter, the People agree with Sanchez that he preserved his argument under Rule 14 but argue that he didn't preserve his argument that joinder was inappropriate under Rule 8(a)(2). The People therefore assert that "the court's decision under Rule 14 is reviewed for harmless error, [but] the question of joinder under Rule 8 is reviewed for plain error." We disagree.

¶ 41    "[A] pretrial motion to sever joined cases is substantively the same as an objection to joinder." *Bondsteel*, ¶ 23. Therefore, Sanchez's argument that the court erred by denying his motion to sever is preserved in its entirety.

¶ 42    Sanchez contends that he was actually prejudiced by the court's decision not to sever the illegal weapon charge because all six factors set forth in *Bondsteel*, ¶ 38, weigh against finding that the illegal weapon charge is of a "same or similar character" to the burglary and theft charges. In support of this contention, Sanchez argues that the weapon charge and the burglary and theft charges don't share substantive elements, modus operandi, or victims.

¶ 43    That may be true, but Rule 8(a)(2) allows offenses to be joined when "the offenses arise from broader circumstances that do not

necessarily constitute one criminal episode," *Williams*, ¶ 44, which is precisely the situation in this case. The burglary-related charges and the weapon charge weren't one criminal episode, but the weapon charge certainly arose from the broader circumstances surrounding the investigation into the burglary because the brass knuckles were discovered after a deputy conducted a search incident to a lawful arrest. Additionally, the offenses were temporally proximate, having occurred one week apart; evidence of the weapon charge and the burglary-related charges — namely, the backpack and testimony from the arresting deputy — overlapped; and the offenses shared a physical proximity because Sanchez had the backpack with the brass knuckles when deputies arrested him a few houses down from where the burglary occurred.

¶ 44      Yet Sanchez argues that he suffered actual prejudice because trying the weapon charge with the burglary-related charges injected extraneous character evidence into the trial, which allowed the jurors to conclude that the sort of person who carries brass knuckles is also the sort of person who commits crimes like burglary. But this argument is a bald assertion. *See People v.*

*Venzor*, 121 P.3d 260, 264 (Colo. App. 2005) (declining to review issues presented in a perfunctory or conclusory manner).

¶ 45 Furthermore, Sanchez doesn't provide any support for his contention that the jury was unable to separate the facts and legal principles applicable to each offense. Instead, Sanchez's argument that he was prejudiced rests on his assertion that "jurors are only human." But this assertion alone without more isn't enough to demonstrate actual prejudice. *See Washington*, ¶ 37 ("The discretionary nature of a Rule 14 decision creates a high bar for a defendant hoping for reversal. The defendant bears the burden of demonstrating . . . 'actual prejudice' caused by the joinder . . . ." (quoting *Bondsteel*, ¶ 59)). And, as Sanchez acknowledges, the court instructed the jury to consider the counts and evidence separately, and we must presume that the jury followed these instructions. *See Bondsteel*, ¶ 62.

¶ 46 Accordingly, we can't conclude that the court abused its discretion when it denied Sanchez's request to sever or, alternatively, bifurcate the weapon count from the other charges.

## V. The Evidence Was Sufficient to Support the Theft Conviction

### A. Applicable Legal Principles

¶ 47　Section 18-4-401(1)(a), C.R.S. 2025, provides that "[a] person commits theft when he . . . knowingly obtains, retains, or exercises control over anything of value of another without authorization" and intends to permanently deprive that person of the use or benefit of the thing of value.

¶ 48　When reviewing a challenge to the sufficiency of the evidence, "[w]e review the record de novo to determine whether the evidence before the jury was sufficient both in quantity and quality to sustain the defendant's conviction." *Clark v. People*, 232 P.3d 1287, 1291 (Colo. 2010). "[T]he prosecution has the burden of establishing a prima facie case of guilt through introduction of sufficient evidence." *Id.* We consider "whether the relevant evidence, both direct and circumstantial, when viewed as a whole and in the light most favorable to the prosecution, is substantial and sufficient to support a conclusion by a reasonable mind that the defendant is guilty of the charge beyond a reasonable doubt." *McCoy v. People*, 2019 CO 44, ¶ 63 (quoting *Clark*, 232 P.3d at 1291).

¶ 49    However, "[w]e do not sit as a thirteenth juror to determine the weight of the evidence presented to the jury." *Clark*, 232 P.3d at 1293.

## B.    Analysis

¶ 50    Sanchez argues that the evidence presented to the jury didn't establish that he obtained, retained, or exercised control over Gonzales's spare car key or charm bracelets. He argues that the prosecution didn't present any evidence that these three items that Gonzales reported were missing were ever "located or placed" in his possession. Sanchez thus asserts that the theft count "rests only on conjecture, assumptions, and speculation." We disagree.

¶ 51    Gonzales testified that, on the day of the burglary, she saw a man she didn't know inside her home. She said that she observed his eyes, forehead, hair, and skin complexion. She also observed his height, weight, and walking gait. Gonzales described the man's physical appearance as including brown eyes and long, braided hair tucked into his shirt.

¶ 52    Gonzales also said that, on all three floors of her house, drawers were open, papers were on the floor, and she could tell that the house wasn't the way she had left it. About a week later, she

called the sheriff's office to report a spare car key and two charm bracelets missing. Gonzales testified that she kept her spare car key in a "junk drawer" and that she always kept the charm bracelets hidden underneath clothes in a drawer in her bedroom. Gonzales participated in the show-up identification one week later and indicated that she was "100% confident" that the man — later identified as Sanchez — was the same man she had previously seen in her house.

¶ 53     While it is true that the prosecution didn't present any direct evidence that Sanchez possessed Gonzales's spare car key or charm bracelets, it was up to the jury to assess the credibility and weight of the evidence presented to it. *See People v. Richardson*, 2018 COA 120, ¶ 13, *aff'd*, 2020 CO 46. There's no indication from the record that it didn't appropriately do so. And based on Gonzales's testimony that she knew the items to be in her home before the burglary and gone after the burglary, and that Sanchez was the unknown person she saw in her house on the date of the burglary, the jury could reasonably infer from the evidence presented to it that the prosecution proved beyond a reasonable doubt all the

elements of theft.[1]  *See id.*; *see also People v. Donald*, 2020 CO 24,

¶ 27 (noting jurors may draw reasonable inferences from both direct

and circumstantial evidence).

¶ 54     Thus, we conclude that the evidence presented, viewed as a

whole and in the light most favorable to the prosecution, was

substantial and sufficient enough to support Sanchez's theft

conviction.  *See McCoy*, ¶ 63.

VI.    Disposition

¶ 55     The judgment is affirmed.

JUDGE TOW and JUDGE LUM concur.

---

[1] Sanchez doesn't dispute that the prosecution presented sufficient evidence to determine the value of the three missing items.